INSURANCE COMPANY *v.* SEAVER.

1. Where two persons were driving sulkies in competition alongside of each other at a horse-race for money,—which sort of race was made illegal by statute,—and on a collision ensuing, one jumped to the ground from his sulky, and was clear from the sulky, harness, and reins, on his feet and uninjured, and instantly spoke to his horse to stop, and then started forward to get hold of the reins, which were hanging across the axletree; and when ahold of, or attempting to get hold of them, was killed by getting tangled in them, falling down and being dragged against a

stone. *Held*, on a suit upon a policy of insurance on the life of the person killed, which made it a condition of paying the sum assured that the contract should not extend to a case of death caused by "duelling, fighting, or other *breach of the law on the part of the assured, or by his wilfully exposing himself to any unnecessary danger or peril*"—that this death was within the condition; and that the leap from the sulky and securing the reins, and the subsequent fall and injury, were so close and immediate in their relation to the racing, and all so manifestly part of one continuous transaction, that it could not be said that there was a new and controlling influence to which the disaster should be attributed.

2. On a suit for the insurance-money on such a policy as the one above-mentioned, and where the language of the condition was the matter referred to by the court, it was error to tell the jury that they were to consider "how ordinary people in the part of the country where the insured reside, in view of the state of things then existing,—the frequency of such races, and the way in which such matches are usually regulated,—would naturally understand such language, whether as precluding such driving or not."

ERROR to the Circuit Court for the District of Vermont.

Mrs. Elizabeth Seaver sued the Travellers' Insurance Company of Hartford on a policy of insurance, which insured her against loss of life of her husband—described in the policy as a livery-stable keeper—caused by any accident within the meaning of the policy and conditions thereto annexed. Among these conditions was one that the insurance should "not extend to death or injury caused by duelling or fighting, *or other breach of the law on the part of the assured,* . . . *or by his wilfully exposing himself to any unnecessary danger or peril.*" Seaver, the husband, was killed suddenly at Morrisville, Vermont, immediately after jumping from a sulky, in which he was driving in a match race, on the event of which a considerable sum of money was wagered. The defence of the company, as the case was submitted to the jury, was, that his death was caused by a breach of the law, and by his wilfully exposing himself to unnecessary danger.

The plaintiff's evidence, as the bill of exceptions showed, tended to prove that at the race Seaver was driving a mare and sulky; that one Gilmore was driving a horse and sulky in competition alongside; that the track was "in form like the link of a chain," in other words was an oval track; and

that soon after leaving the judge's stand, Seaver having the inside track, and his mare and Gilmore's horse being nearly abreast, Seaver's mare broke and fell back, and that Gilmore's horse got a little ahead; that Gilmore thereupon reined in towards the inside track, apparently to get the inside track—his team being then about half its length ahead of Seaver's mare—that Seaver's mare at that moment regained her speed, and, gaining on the other horse, the sulkies came into collision. That the wheel of Seaver passed over the near wheel of Gilmore, and that Seaver instantly jumped from his sulky, and struck upon the grass-ground off the track, upon his feet, uninjured, some two or three feet from his sulky, and entirely free from it; that if he had remained standing where he struck, he would have received no injury; that he instantly spoke to his mare, and that the mare slackened her speed, and that Seaver started to catch her, and, with that purpose, ran a distance of some twenty feet by her side, trying to get hold of the reins to stop her; that the reins were hanging loosely across the axle-tree of the carriage; that when Seaver ran the distance as aforesaid, and while thus running with one hand either ahold of or grasping for the reins, the mare turned in upon the grass-ground and towards Seaver, throwing him down, when in some way he became entangled in the reins, and was dragged along a few feet until his head struck a stone with great force; that Seaver was immediately taken up insensible and carried into the house, and that he died the next morning from the injury.

The plaintiff's evidence further tended to show that by the rules of the trotting course Gilmore had not the right to attempt to take the inside track until he had passed Seaver a distance equal to the whole length of Seaver's team.

The defendant gave in evidence section nine of chapter cxix of the General Statutes of Vermont, which was as follows:

" All racing, running, trotting, or pacing of any horse or horse kind for any bet or wager of money or other valuable

thing, or for any purse or stake made, is hereby declared a misdemeanor, and the parties, contrivers, aiders and abettors thereof, shall pay a fine not exceeding $500."

The court charged as follows:

"That, for the purposes of this trial, the jury were to regard the trotting race in which the insured was engaged when he jumped from his sulky and was killed, as a breach of the law within the meaning of the conditions of the policy.

"That the jury were, therefore, to inquire whether the death of the insured was occasioned by the breach of the law; that this was a question for the jury.

"That if the jury should find that Seaver was killed by the race itself, by an ordinary accident of the race, so that the race was the proximate cause of the death, the plaintiff could not recover; but if the jury should find that Gilmore turned his horse intentionally and tortiously, with the purpose of winning the race at all hazards, whether he should crowd Seaver from the track or not, then that the conduct of Gilmore and not the race would be the proximate cause of the death, and the plaintiff would be entitled to recover.

"That the plaintiff's evidence showed that Gilmore, turning in as he did, was in violation of the rules of the race; that a man was usually to be taken as intending the natural and necessary consequences of his own acts. And that if the jury were of opinion that Gilmore drove, as he did tortiously, and with the intention of winning the race in any event, even though in his so doing he should crowd Seaver from the track and upset him, and that such driving caused the death of Seaver, then the jury should find for the plaintiff.

"That if the death of the insured was caused by the wilful exposure of himself to an unnecessary danger or peril within the meaning of the other clause in the policy relied on by the defendants, the plaintiff would not be entitled to recover.

"That upon this part of the case, it was to be considered, however, that the language of this clause must be taken most strongly against the defendant, because used in their policy, and for the purpose of inducing parties to take policies;

"And that it was further to be considered how ordinary people in the part of the country where the insured reside, in view of the state of things then existing, the frequency of such

races, and the way in which such matches are usually regulated, would naturally understand such language, whether as precluding such driving or not.

" That the jury should also consider the nature of the business of the insured, as set forth in the application, and therefore known to the defendant,—that of livery-stable keeper,—which, of course, embraced the management and driving of horses.

" That the question was not what construction would be given to the language at Hartford, where the defendants' company was located, but, in view of all the circumstances and conditions above alluded to, whether intelligent, fair-minded people in the vicinity of the insured where the contract was made, would regard it as excluding the driving of such a race, and, if not, that the case would not come within the proviso of that clause in the policy, and the plaintiff would, so far as that is concerned, be entitled to recover."

The jury found a general verdict for the plaintiff, and found, in addition, in answer to questions specially submitted, a special finding thus :

" That when the sulky of Seaver came into collision with the sulky of Gilmore, Seaver jumped to the ground and was entirely clear from the sulky, harness, and reins, upright and uninjured, and spoke to his horse to stop, and then started forward to get hold of the lines to stop him, and in that attempt was killed."

The company excepted to the charge of the court, and, judgment going for the plaintiff, it brought the case here.

*Mr. E. J. Phelps, for the insurance company, plaintiff in error :*

1. The death of the assured was caused by the race. No new event intervened. The plain terms of the policy are not to be evaded by metaphysical subtlety.

The distinction adopted by the court below between an accident resulting from the race, and an accident resulting from the carelessness of the driver at the race, cannot be maintained. An accident is never the *necessary* consequence of a race ; *some* incident or other must intervene to produce it ; the misconduct of the driver, a defect in the vehicle, the harness, or the track, a fright or stumbling of the horse.

In all these cases, might it be argued with the same propriety, that the injury was not caused by the race, but by the intervening incident that immediately occasioned it. If such were its interpretation no death could ever be caused by a breach of the law. Recklessness and unfairness in driving are natural incidents in such a contest, frequently occurring, and reasonably to be expected. They are perhaps the principal source of danger. The court will not investigate whether a transaction that was criminal throughout, was conducted according to the rules established for its management by those engaged in it. The case of *Insurance Company* v. *Tweed* * is decisive to show that the race was the cause of the death.

2. The jury should have been instructed that the driving of the race by the assured was a wilful exposure of himself to "an unnecessary danger or peril," within the meaning of the terms of the policy; and the instruction given was erroneous. The voluntary engagement of the assured in an illegal act of a dangerous character will be conceded. He lost his life by the danger thus incurred. The term "*necessary*" should doubtless receive a reasonable rather than a literal definition. But not even upon the most liberal construction can it be maintained, that an act which is criminal, is reasonably necessary; or that the peril thereby incurred under the circumstances of this case was not an apparent peril, obvious to the common sense, and shown by the common experience of mankind. The evidence on this point raised no question proper to be submitted to a jury. The construction of the policy upon the conceded facts was for the court and not for the jury. But if any question should have been submitted at all, the rule laid down by the court was wrong. Under the rule laid down, evidence to prove the opinion entertained on the subject by "fair-minded and intelligent" citizens, would necessarily become admissible. And the opinion of the majority would determine the point.

---

* 7 Wallace, 44.

*Messrs. G. F. Edmunds and H. H. Powers, contra:*

1. The object of life insurance being to provide for the necessities of the family, the object is a meritorious one, and courts so construe such contracts as to effectuate the object, if possible. An exception in a policy is to be taken strongest against the company; and if the exception is susceptible of different constructions, that must be taken which is most liberal to the policy-holder.

2. The policy in question insured Seaver against *all accidents* causing *personal injury;* and it was made known to the company, in the application, that Seaver was a livery-stable keeper; concerned, of course, in the management of horses. He so pays the consideration of an assurance against *any accident* occurring in *that business* as well as any other. The death was occasioned by an *accident* in that business, " an event happening unforeseen, casualty, chance."*

If Gilmore while riding by Seaver's side had suddenly drawn a pistol and shot him, the death of Seaver would be an accidental death. Now, it makes no difference how Gilmore kills Seaver, whether by shooting him, or, unexpectedly to Seaver, driving intentionally and tortiously against him. In either event his injuries were accidental.

3. The proviso in the policy is that the insurance shall not extend to "any death or injury *caused* by duelling or fighting, or other breach of the law on the part of the assured." Now, where general words follow special words of confined meaning, the general words are limited to subjects *ejusdem generis.* By this proviso the company seek to exempt themselves from their liability for *personal injuries only,* which liability is the very thing Seaver contracts for. The special words, "duelling" and "fighting," refer to acts which necessarily import *personal injury.* In either case the party engaged inflicts, and expects to receive such injury. The *general* words " or other breach of the law" must be confined to such illegal acts as naturally, legitimately, and usually result in personal injury. The statute of Vermont

---

* Johnson's Dictionary; Worcester, *in verbo.*

does not make the act of driving a race illegal.   It is the *wager of money* that taints the transaction.   The breach of such a law in no sense naturally or usually imports or results in personal injury.

4. The maxim *"Non remota causa sed proxima spectatur"* applies.   It is clear that a relation must exist between the violation of law and the death, to make the defence; that the death must have been caused by the violation of law to exempt the company from liability.   It cannot be the true meaning of the proviso that the policy is to be avoided by the mere fact that at the time of the death the assured was violating the law, if the death occurred from some cause other than such violation.*

Seaver's death, if happening while violating a law, was in no legal sense *caused* by such violation.   Suppose Seaver and Gilmore on Monday drive a race for pleasure, with no wager depending, as they may lawfully do, and a collision occurs by the wrongful act of Gilmore, and Seaver is injured in all respects precisely in the manner shown in this case, what is the cause of his injuries?   No law is being violated, and some cause, of necessity, exists.   A personal injury like this must have some efficient working cause; obviously, the wrongful act of Gilmore is the proximate working cause of such injury.   Could the cause be different if on Tuesday they drive a race, with a wager depending, and so unlawfully, and Seaver is injured, in all respects, the same as on Monday?

Again, in New York, racing for a purse is not illegal. A., insured by this company, rides a race there for a purse, and is injured.   B., holding a policy of this company *ver-*

* Ionides *v.* Insurance Company, 108 English Common Law, 259; Marsdon *v.* City and County Assurance Company, 1 Law Reports Common Pleas, 232; Patrick *v.* Com. Insurance Company, 11 Johnson, 14; Waters *v.* Louisville Insurance Company, 11 Peters, 213; Harper *v.* Insurance Company, 19 Missouri, 506; Breasted *v.* Farmers' Loan and Trust Company, 8 New York, 304; Cluff *v.* Mutual Benefit Life Insurance Company, 13 Allen, 309, and 99 Massachusetts, 317; Bradley *v.* Mutual Benefit Life Insurance Company, 45 New York, 422.

*batim* like A.'s, rides a race in Vermont for a purse, and is injured in precisely the same manner as A. The company say the cause of A.'s injury is different from B.'s.

In *Insurance Company* v. *Tweed*, this court says:

"If a new force or power has intervened of itself, sufficient to stand as the cause of the misfortune, the other must be considered as too remote."

A new force did here intervene after Seaver commenced the race, sufficient to stand as the cause of the misfortune. This 'is found- as a fact in the special finding of the jury, *supra*, p. 535. It shows that when Seaver was injured he had ceased all connection with the race. The accident of the race was the collision. By *that* accident Seaver was uninjured. He jumped to the ground, and had he remained standing where he landed he would have been unhurt. He then sets out upon a new undertaking, and in a *foot race* after his horse, when, of course, the race was broken up and ended, he first and alone was injured.

*Reply :* The argument of the other side is that as, under the statute, the illegality of the race consisted in its being run for money, and as the *wager* was not the cause of the death but, at most, the *race*, therefore, the death was not caused by any breach of the law. But the whole transaction must be taken together. If there had been no purse there would, doubtless, have been no race. At any rate there was money staked here, and it was in *racing for the money* that the death occurred.

Mr. Justice MILLER delivered the opinion of the court.

The statutes of Vermont make all horse-racing for any bet or wager a misdemeanor, and impose a fine not exceeding $500 for the offence.

In regard to this branch of the defence the court instructed the jury that they were to regard the trotting race, in which the insured was engaged when he jumped from the sulky and was killed, as a breach of the law within the meaning

of the clause of the policy on that subject.    As the plaintiff below took no exception to this ruling and had a verdict, no error can be assigned on it here, and we need not further examine the argument of her counsel, which controverts that proposition.

The court further instructed the jury on this branch of the subject, as follows:

"That if the jury should find that Seaver was killed by the race itself, by an ordinary accident of the race, so that the race was the proximate cause of the death, the plaintiff could not recover; but if the jury should find that Gilmore turned his horse in intentionally and tortiously, with the purpose of winning the race at all hazards, whether he should crowd Seaver from the track or not, then that the conduct of Gilmore and not the race would be the proximate cause of the death, and the plaintiff would be entitled to recover.

" That the plaintiff's evidence showed that Gilmore, turning in as he did, was in violation of the rules of the race; that a man was usually to be taken as intending the natural and necessary consequences of his own acts.    And that if the jury were of opinion that Gilmore drove, as he did, tortiously, and with the intention of winning the race in any event, even though in his so doing he should crowd Seaver from the track and upset him, and that such driving caused the death of Seaver, then the jury should find for the plaintiff."

In regard to this the plaintiff in error contends that no evidence was given tending to show that Gilmore intentionally and tortiously turned his horse, with the purpose of winning the race at all hazards, whether he should crowd Seaver from the track or not.    All that the bill of exceptions discloses on this point is, that Seaver, having the inside track, his mare broke and fell back a little; " that Gilmore thereupon reined in towards the inside of the track, apparently to get the inside track, his team being then about half its length ahead of Seaver's mare; that Seaver's mare at

that moment regained her speed, and, gaining on the other horse, the sulkies came into collision."

We think this a very slender foundation to put to the jury the question of Gilmore's tortious intention to drive Seaver from the track at all hazards, and to rest upon that possible secret intention the proposition that the race was not the proximate cause of the death, but that Gilmore's act was. It was well calculated to mislead, and no doubt did mislead, the jury. If the legal proposition was sound, the state of the testimony, as given in the bill of exceptions, on which it was founded, could hardly justify it. It would have been much nearer sound principle to have said to the jury that if Seaver saw that Gilmore was ahead of him ever so little, his persistence in so running his horse as to bring about a collision was wilfully exposing himself to danger within the meaning of the policy.

But we are of opinion that if the testimony raised the point the instruction was erroneous. The company in protecting themselves against accident or death caused by a violation of law, acted upon a wise and prudent estimate of the dangers to the person generally connected with such violations. And in the class of cases under consideration we have no question that the sum of money often at stake stimulates to further acts of carelessness in the way of violence, fraud, and a disregard of the rules of fair racing, which increase largely the dangers always attendant on that sport. The class of men who collect on such occasions, and who often become the leading parties in the conduct of the affair when large sums of money are wagered, have led to its denunciation by many wise and thoughtful people, and very surely adds to the risk of personal injury to the rider or driver. It was against this general species of danger, attending nearly all infractions of the law, that the company sought to protect itself by the clause of the policy in question, and of this class was the reckless driving of Gilmore. If his intentions were as bad as the instructions imply, they did not take the case out of the protection of the clause.

If Seaver had died the moment he was thrown from the

sulky, his death would have been caused by a violation of the law, though Gilmore may have disregarded the rules of the course, and may have intentionally sought to run Seaver off the track.

The jury, in response to a request to find specially on certain points, did, in addition to a general verdict in favor of the plaintiff, make the following special finding:

" And the jury further find, that when the sulky of Seaver came into collision with the sulky of Gilmore, Seaver jumped to the ground and was entirely clear from the sulky, harness, and reins, upright and uninjured, and spoke to his horse to stop, and then started forward to get hold of the lines to stop him, and in that attempt was killed."

It is said that this verdict is conclusive that the death of the deceased was not caused by the violation of the law in trotting for a wager, but by his own voluntary act when he was not trotting; and both parties appeal to the case of *Insurance Company* v. *Tweed*,* where it is said that when a new force or cause of the injury intervenes between the original cause and the accident, the former is the proximate cause.

But we do not think this new force or cause is sufficiently made out by this verdict. The leap from the sulky and securing the reins, and the subsequent fall and injury to Seaver are so close and immediate in their relation to his racing, and all so manifestly part of one continuous transaction, that we cannot, as this finding presents it, say there was a new and controlling influence to which the disaster should be attributed. If he had been landed safely from his sulky and, after being assured of his position, had, with full knowledge of what he was doing, gone to catch the animal, his death in that pursuit when the race was lost might have been too remote to bring the case within the exception.

But as the finding presents it, we cannot say that the accident was not caused by the race which was itself a violation of the law, and which might still have gone on had he caught his mare in time.

---

* 7 Wallace, 44.

And we are to consider that both this special finding and the general verdict were probably influenced by the erroneous instruction we have already considered, and by that we are now about to mention.

The jury were told that if the death of the insured was caused by the wilful exposure of himself to an unnecessary danger or peril within the meaning of the other clause in the policy relied on by the defendants, the plaintiff would not be entitled to recover.   The court added:

" Upon this part of the case, it was to be considered, however, that the language of this clause must be taken most strongly against the defendant, because used in their policy, and for the purpose of inducing parties to take policies.

" It was also further to be considered how ordinary people in the part of the country where the insured resided, in view of the state of things then existing, the frequency of such races, and the way in which such matches are usually regulated, would naturally understand such language, whether as precluding such driving or not.

" The jury should also consider the nature of the business of the insured, as set forth in the application, and, therefore, known to the defendant, that of a livery-stable keeper, which of course embraced the management and driving of horses.

" That the question was not what construction would be given to the language at Hartford, where the defendant's company is located, but, in view of all the circumstances and conditions above alluded to, whether intelligent, fair-minded people in the vicinity of the insured where the contract was made, would regard it as excluding the driving of such a race, and, if not, that the case would not come within the proviso of that clause in the policy, and the plaintiff would, so far as that is concerned, be entitled to recover."

We are of opinion that the language of this policy is to be construed by the court, so far as it involved matters of law, and by the jury aided by the court when it involved law and fact, and that in neither view of it was the opinion of ordinary people in view of the state of things where the deceased resided, or their understanding of its language in view of the

circumstances of the case, any sound criterion by which the judgment of the jury should be formed, and the instruction in this branch of the case was unwarranted and misleading.

The jury should have been left to decide for themselves, under all the facts before them attending the death of the insured, whether it was caused by his wilful exposure to an unnecessary danger or peril. Such light as the court as a matter of law could give them, on the subject of the wilfulness of his conduct, or the presence or absence of any necessity or the character of the necessity which would justify him, might be proper, but this general reference to what ordinary people in a particular locality might think about it, was clearly not so.

For the errors here considered, the JUDGMENT IS REVERSED, with direction to

GRANT A NEW TRIAL.