## HUTTO v. ATLANTIC LIFE INS. CO.
### No. 3238.

Circuit Court of Appeals, Fourth Circuit.
April 13, 1932.

HAYES, District Judge, dissenting.

M. E. Zeigler and A. J. Hydrick, both of Orangeburg, S. C., for appellant.

Alexander W. Parker, of Richmond, Va., and Alva M. Lumpkin, of Columbia, S. C. (Thomas & Lumpkin, of Columbia, S. C., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and HAYES, District Judge.

PARKER, Circuit Judge.

This is an appeal from a judgment in an action on two life insurance policies. The company paid the face of the policies, but contested liability on the double indemnity provisions contained therein. The judge below directed a verdict for the insurance company on the ground that the evidence showed that at the time of his death insured was engaged in the commission of a crime involving moral turpitude, and that, because of this fact, there was no liability under the double indemnity provisions.

Each policy sued on contained a provision to the effect that the company would pay double the face of the policy if the death of the insured should result directly, exclusively, and independently of all other causes from bodily injury effected solely through external, violent, and accidental means. A condition of the provision was that the injury should not be intentionally inflicted by another person or by the insured himself, and should not occur while the insured was "engaged in any violation of law involving moral turpitude."

Insured, a young white man, was shot on a Sunday morning at a house where lived a colored woman and her seventeen year old daughter and some younger children. The house did not bear a good reputation. Insured had gone there with another white man who, for some reason, was not called as a witness. The only testimony as to the manner in which he was shot was given by the seventeen year old colored girl. She testified that the insured came into the back room of the house where she was and assaulted her in an indecent manner; that she picked up a pistol which was lying near by and pointed it at the insured; that in the scuffle which ensued the pistol was discharged, the bullet striking the insured and causing his death. While there were some minor contradictions in the testimony of this witness, there was no evidence that the shooting occurred other than as she testified, and any hypothesis to the contrary is based upon pure speculation and not supported by any proof.

We agree that this evidence does not show conclusively that insured was engaged in an assault with intent to commit rape. To constitute such crime there must be intent to have carnal knowledge of a female forcibly and against her will and notwithstanding any resistance on her part; and, in view of the surrounding circumstances here, the jury might have inferred that, while insured intended to have sexual intercourse with the witness, he did not intend to ravish her if she continued to resist. But upon the evidence there is no escaping the conclusion that the insured was engaged in an indecent assault upon the witness. The least touching of the person of another in rudeness or in violence constitutes an assault and battery. And there can be no question but that an assault upon a female with the object of having sexual intercourse with her, even if the intent to ravish be not present, is an "assault

and battery of a high and aggravated nature" under the law of South Carolina. State v. Jones, 133 S. C. 167, 130 S. E. 747; State v. Dalby, 86 S. C. 367, 68 S. E. 633.

And we think it equally clear that such an assault is a crime involving moral turpitude within the meaning of the provision of the policies sued on. A crime involves moral turpitude if it involves an act of baseness, vileness, or depravity when judged in the light of the social duties which a man owes to his fellow man or to society in general. 25 Cyc. 272; 36 C. J. 1194; Sipp v. Coleman (C. C.) 179 F. 997; In re Bartos (D. C.) 13 F.(2d) 138; Skrmetta v. Coykendall (D. C.) 16 F.(2d) 783. Standards of morals change with the changing conditions of civilization; but it is beyond question that, when judged by the moral standard of this age and country, an indecent assault upon a female is a crime involving moral turpitude.

■ It was while engaged in the commission of such a crime that the insured received the injury that caused his death; and we think it clear that the injury was caused by the unlawful conduct in which he was engaged. Whether insured was shot by the accidental discharge of the pistol while he and witness were scuffling, or whether the pistol was dropped in the scuffle and fired as it struck the floor, the shooting was the result of the insured's engaging in the assault upon the witness. See Travelers' Insurance Co. v. Seaver, 19 Wall. 531, 22 L. Ed. 155; Bloom v. Franklin Life Ins. Co., 97 Ind. 478, 49 Am. Rep. 469.

An interesting question, which we need not decide, is whether under the terms of this policy it was necessary for any causative connection to be shown between the unlawful act and the injury. It is said that the contract embodied in clear and unambiguous language that the double indemnity provision should not cover death resulting from an injury which should occur while the insured was engaged in any violation of law involving moral turpitude. And it is argued that the purpose of this provision is to guard against the increase of hazard which would result from the insured's being so engaged, and that its result is to make the double indemnity provision inapplicable in the case of an injury occurring during the period that he is so engaged, irrespective of the cause of the injury. There is much to be said for this contention. Certain it is that it is not the function of the courts to make contracts, but to construe them; and if the parties to a contract of insurance provide that same shall not cover a given risk while insured is engaged in certain conduct, or occupying a certain status thought to involve an increase of hazard, there would seem to be nothing for the courts to do but to enforce their contract as they have made it. Flannagan v. Provident Life & Accident Ins. Co. (C. C. A. 4th) 22 F.(2d) 136; Order of United Com. Travelers v. Greer (C. C. A. 10th) 43 F.(2d) 499. We need not decide this question, however, as we are satisfied that the causal connection in this case was clearly established by evidence which was not controverted.

■ It is true that, when it was established that the death of the insured was caused by a pistol shot, the burden rested upon the company to bring the case within the terms of the condition upon which it relied; but, as stated above, we think that the evidence clearly did this. In the federal courts it is the duty of the judge to direct a verdict where the evidence is all one way, or where it so clearly supports a conclusion that a verdict to the contrary would not be allowed to stand. The evidence here was of that sort. It clearly shows that the death of insured resulted from an injury which occurred while he was engaged in a violation of law involving moral turpitude, and which resulted from such violation. There is no evidence, in our opinion, to the contrary; and verdicts must rest upon evidence and not upon supposition.

There was no error, and the judgment below will be affirmed.

Affirmed.

HAYES, District Judge (dissenting).

I am unable to agree that the evidence conclusively showed, at the time of his death, insured was engaged in the commission of a crime involving moral turpitude, and am convinced that the evidence warranted the submission, under appropriate instructions, of the issues to the jury.

It is error to direct a verdict as to the cause of death where there is evidence sufficient to justify a contrary finding, and, where there is any evidence to support a verdict for the insured, the court is not justified in directing a verdict for the insurer. Couch on Insurance, vol. 6, page 6910.

Where there is any evidence to show that the death may have resulted from accident, suicide, or a violation of law involving moral turpitude, it is for the jury to decide. Travelers' Insurance Co. v. Allen (C. C. A.) 237 F. 78; American Nat. Insurance Co. v. White, 126 Ark. 483, 191 S. W. 25; Hale v.

Life Indemnity Co., 61 Minn. 516, 63 N. W. 1108, 52 Am. St. Rep. 616.

The weight of authority is to the effect that the mere fact that death occurred while the insured was engaged in a violation of law does not exonerate the insurer; it must further establish that the violation of law was the cause of, or had some causative connection with, the accident. Couch on Insurance, vol. t, page 4512, citing Supreme Lodge, K. P. v. Beck, 181 U. S. 49, 21 S. Ct. 532, 45 L. Ed. 741, and numerous authorities from Illinois, Iowa, Massachusetts, Michigan, Minnesota, New York, Pennsylvania, and Tennessee. The same principle is stated with approval in Cooley on Insurance, vol. 4, page 3149.

In the case of Supreme Lodge, K. P. v. Crenshaw, 129 Ga. 195, 58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St. Rep. 216, 12 Ann. Cas. 307, the insured was killed by a husband, either while he was attempting to have sexual intercourse with the wife, or immediately thereafter, and it was held that the death of the insured was not caused or superinduced in the violation of, or attempt to violate, any criminal law, within the meaning of the policy. Numerous cases are cited in the note to that case dealing with violations of law and personal encounters.

In Accident Insurance Co. v. Bennett, 90 Tenn. 256, 16 S. W. 723, 25 Am. St. Rep. 685, it is held under a policy stipulating that the insurance does not extend to injuries received while engaged in, or in consequence of, any unlawful act, the fact that the insured was killed while living in a state of fornication with his mistress does not prevent a recovery, where it does not appear that the infliction of injury is a natural and necessary consequence of the unlawful association, as its probable and to be anticipated result.

A verdict was directed for defendant on the ground that the testimony is susceptible of only one inference, and that is that the insured came to his death while engaged in violation of law involving moral turpitude; and, as death from such cause was expressly excepted from the terms of the policy, no amount was due plaintiff.

There was not a scintilla of evidence, except the testimony of Irene Hezekiah, colored, a sixteen year old girl, at the time of insured's death, that the deceased violated any law. The insured, a white man in good health, age 24, and another white man, went into the home of Rosa Lee Hezekiah, mother of Irene, on Sunday morning. The living room was large, and from it was a door opening into a bedroom, 10x14 feet, in which were two beds. Irene was making up the beds. The door was open and Cora Lee Johnson, a twelve year old girl, was standing in it. Irene's mother, her uncle, a grown man, the white man who came with insured, and some children were in the living room. Insured went into the bedroom where Irene was making up the beds, and in a few minutes a pistol shot was heard, and Irene and Cora Lee ran out of the bedroom into the living room and Irene exclaimed, "He shot himself." The uncle, the mother, and Cora Lee were witnesses and testified that the shot was the first noise they heard. Even Irene testified that she didn't speak or make a sound before the shot was fired. The deceased fell within three or four feet of the door, and died without regaining consciousness. A pistol was lying near him which is concededly the weapon with which he was killed. It belonged to a roomer at the house. Irene placed it on the bed before deceased came, knew it was out of repair, that the trigger stayed back against the trigger guard, and that it was necessary to push it forward and then pull it before it would shoot, and that she did not push it forward. The officer experimented with the pistol and verified these facts.

The insured was killed before noon, and late that afternoon Irene was arrested and carried to prison charged with killing deceased. She was released on bond, and her case had not been tried when she testified in this case.

On her direct examination, the reasonable inference to be deducted from her testimony is that the insured was attempting to ravish her, and, while he had her down in a helpless position, that she struggled to, and did, get the pistol to scare him, whereupon he knocked her hand and the pistol fired; that she did not intend to shoot him.

On cross-examination she admitted she had extricated herself from the helpless position; that she was standing near the bed and reached for the pistol; that he hit her hand and it fired; but was unable to say whether it fired in her hand or after it hit the floor. She admitted that she did not scream, or make any call for help, and that she did not intend to hurt him. It is true that there was no witness to contradict her except her declaration at the time of the shooting that he shot himself. Does her testimony, under these conditions, force us to but one inference; namely, that deceased came to his death while engaged in the violation of law involving moral turpitude?

If deceased had not been wounded and the girl had prosecuted him for assault with intent to commit rape, or an assault of a high and aggravated nature, under the law of South Carolina, it cannot be assumed that all reasonable men would draw but one inference, to wit, that he was guilty.

Would a sane sober man attempt such an offense under the conditions proven? There was no evidence that he was feeble-minded, and none that he was drunk, except Irene said she smelt the odor of liquor on him. He could see the twelve year old girl standing in the open door. He knew Irene's mother and her grown uncle were in the adjoining room. Surely the conceded surroundings of the parties call for scrutiny of such testimony. Assume, however, that he did, as testified by Irene, conduct himself in a manner so contrary to human experience, how can we escape the fact that this 16 year old girl resisted so ferocious an assault for ten minutes without making a single outcry for help, especially when she knew there was so much assistance in the adjoining room, easily within the sound of her voice? If this rapacious struggle lasted for ten minutes, it looks like such a struggle would have attracted the attention of the girl standing in the door.

Outside of Irene's testimony, and the fact that insured went into that room and was killed there, there is not a word of evidence to support Irene in her charge that he was violating the law. It is not safe to draw every adverse inference because of the place where deceased met his death. Deceased may have possessed improper motives and contemplated gravely immoral conduct, but the immorality may not have resulted in a violation of law as stipulated in the policies.

The uncontradicted testimony of a witness, not impeached or discredited, to a plain and simple fact capable of contradiction, if untrue, does not raise a jury question. But where there are facts and circumstances, or contradictory testimony, or where the testimony cannot be controverted because it relates to statements by, or transactions with, a decedent, it is for the jury to pass on its truthfulness. Mutual Life Insurance Co. v. Sargent (C. C. A. 5th) 51 F.(2d) 4.

If we accept the girl's version of an attempt to rape and the inference that she shot in self-defense and of right, it is for the jury to determine the question as was held in Ætna Life Insurance Co. v. Hagemyer (C. C. A. 5th) 53 F.(2d) 636.

To sustain the trial below, we must hold upon Irene's unsupported testimony that but one inference can be justifiably drawn from all the evidence. The res gestæ statement that he killed himself is, at least, some inconsistency with her version given at the trial. She had little opportunity to concoct a story then, and she was talking to her mother and uncle. The violation of law by deceased was first advanced at the trial, so far as the record discloses. If he was in fact trying to rape her, it is strange that she said he shot himself. Her exclamation at the time and the inconsistencies in her testimony, and the grave improbabilities of the correctness of her testimony, her motive to exculpate herself from wrongdoing and to place all responsibility on the dead, who cannot give his version, when considered in the light of the entire evidence, leaves more than one inference as to whether deceased was violating any law at the time of his death, and the jury should have been permitted to ascertain the truth of the matter under appropriate instructions from the court.

The direction of a verdict on this record requires the exclusion of every inference favorable to the plaintiff, and the adoption of every inference arising in favor of the defendant. This is contrary to the accepted rule and virtually vests in the judge the power to weigh the evidence and deprive litigants of a trial by a jury. A jury under appropriate instructions might find for defendant, but the evidence does not conclusively show that deceased was violating a law involving moral turpitude, but rests solely on the veracity of an interested witness who made conflicting statements about the tragedy, and it should have been submitted to the jury.

Her first statement that he killed himself does not of itself establish suicide; it does not exclude accidents. Tabor v. Insurance Co. (C. C. A. 4th Circuit) 13 F.(2d) 765.

Under the testimony a jury could find that deceased committed suicide, that he was killed accidentally, that he was intentionally or unintentionally killed while attempting to commit rape, or while committing an assault of a high and aggravated nature, or while committing a mere assault in the sense that he was laying his hands on her against her will but without any intention to harm her, or any reasonable expectation that she would assault him. The inference that he or she was fooling or experimenting with the pistol trigger, which was not working properly, and the pistol fired under those circumstances, is not entirely excluded.

Truth does not have to flounder. It needs no ornaments. It can be told by unlettered

people. It travels a straight course; it turns neither to the right nor to the left. Had deceased been assaulting her as testified by her, it is rather unusual that she made no reference to it to her mother or uncle when she ran out of the room. It is still strange why she exclaimed then that he shot himself. Her version given as a witness may be the truth and may lead to but one inference in the minds of all reasonable men, but I am unable to see it that way.

If, however, the veracity of the girl is accepted, her evidence is consistent with the idea that the shooting was wholly accidental and in no way caused by any violation of law. She does not contend that she shot, or intended to shoot, to repel an assault. If, under the conditions she relates, the roof of the house had fallen on the insured and killed him, the defendant, in my opinion, would have been liable. There must be causative connection with the violation to escape liability.