# Staunton

## SOUTH ATLANTIC LIFE INSURANCE COMPANY V. HURT'S ADMINISTRATRIX.

### September 11, 1913.

#### Absent, Keith, P.

1. LIFE INSURANCE—*Suicide—Burden of Proof—Circumstantial Evidence of Death.*—Where the defense to an action on a life insurance policy is that the defendant committed suicide, the burden is upon the defendant to show by clear and satisfactory evidence that the insured did actually commit suicide. A mere preponderance of the evidence is not sufficient. The mere fact that the body of an insured is found with a pistol in his hand and a bullet wound in his head is not sufficient to prove suicide. When the evidence of self-destruction is circumstantial, the defendant fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident.

2. SANITY—*Presumption.*—Every man is presumed to be sane until the contrary is shown, and the burden is upon the party alleging insanity to prove it.

3. SANITY—*Insane Relatives—Presumption.*—Where no word or act on the part of a person whose sanity is questioned is shown, the fact that he has had insane relatives, standing alone, raises no presumption of insanity.

4. LIFE INSURANCE—*Suicide—Question for Jury.*—Where the suicide of the insured is the issue in an action on life insurance policy, and the proof (while tending to show suicide) does not exclude, with reasonable certainty, death from accident, it is proper to leave to the jury to say whether or not it was a case of suicide, as the burden on such issue is on the defendant.

5. LIFE INSURANCE—*Evidence—Cause of Death—Physician's Certificate—Harmless Error.*—In an action on a life insurance policy it is not error to exclude from the jury the sworn statement of the attending physician in a proof of death as to the cause of death of the insured where death resulted from a gun-shot wound, and the physician knew no more about what caused it than anyone else who saw the dead body. But, even if such ex-

clusion was error, it was harmless in the case at bar, as the
physician was subsequently put upon the stand, and all he knew
upon the subject was put completely and effectually before the
jury.

6.  LIFE INSURANCE—*Fraudulent Answers—Physical Diseases—Insan-
ity—Case at Bar.*—Untrue answers to questions propounded on
an application for a life insurance policy, in order to be fraud-
ulent, must be wilfully false. In the case at bar, the collocation
of the question, "Have any of your uncles or aunts had con-
sumption, or any hereditary disease?" would seem to indicate
that the inquiry was directed to physical diseases, and not to
diseases of the mind, as insanity.

7.  LIFE INSURANCE—*Medical Examiner—Agent of Insurer—Knowledge.*
The medical examiner of a life insurance company who writes
in the application the answers of the applicant for the policy
to the questions propounded to him is the agent of the company,
and the company is bound by any information he has at the
time he fills out the application for the insured. In the case at
bar, the medical examiner of the company was thoroughly
familiar with all the facts as to which it is alleged the insured
made false answers.

Error to a judgment of the Circuit Court of Tazewell
county in an action of assumpsit. Judgment for the plain-
tiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Henry, Graham & Hawthorne* and *Thos. B. Gray,* for the
plaintiff in error.

*Greever & Gillespie* and *Chapman & Gillespie,* for the
defendant in error.

HARRISON, J., delivered the opinion of the court.

Ollie L. Hurt, administratrix of John B. Hurt, deceased,
recovered a judgment against the South Atlantic Life In-
surance Company in the circuit court of Tazewell county
for $5,000, the amount of a policy of insurance issued by

the defendant company upon the life of the plaintiff's intestate; and upon the petition of the company this judgment is now before us for review.

Upon the trial of the case the defendant company interposed the plea of non assumpsit and a special plea of tendering the plaintiff $27.30, being the amount of reserve fund held on account of the contract sued on, which it claimed was all that was due under the policy. Being required to file a statement of its grounds of defense, the company made two contentions: First, that the insured, during the first twelve months from the date of the policy, committed suicide; and, second, that the insured made in his application for insurance untrue answers to certain questions, which were material to the risk contracted for in the policy, thereby voiding the same.

From the evidence adduced it can be stated with confidence that at the time the policy in question was issued the insured was in good health, and that the application was made and the policy accepted by him in good faith. The evidence as a whole reveals the insured as a man of the highest integrity, of unusual business ability, possessed of large real and personal property, actively engaged in the successful prosecution of extensive business interests, with a large and happy family consisting of his wife and eight children, to which he was attached and in which he took great pride. Up to the time of his death he was full of plans for the future, with every confidence in his ability to carry them through successfully, with nothing to trouble him in any of his affairs, either in business or in his personal relations.

These were the conditions of the insured and the circumstances surrounding him up to the morning of January 26, 1911, when he left his home with two of his work hands to feed his cattle. After the cattle were fed he directed his men to return to the house, saying that he would re-

main "to watch the hogs away from the cattle." Failing to return to his home that day, search was instituted, and his dead body was found on the following morning in a pasture some distance from his home, death having been caused by a gun-shot wound in his temple. The body was found in an adjoining field to that in which the cattle had been fed, at the foot of a stump, lying on the left side with his feet partly drawn up. The left arm and hand were under him, and the right arm thrown across his body with the right hand resting upon the butt of a .38 calibre pistol, which showed that one chamber was empty. The deceased was shown to have owned a pistol which was not found after his death.

While two grounds of defense were set out by the defendant company, the record discloses that the real contest was that the insured committed suicide within twelve months after the date of the policy. The great weight of authority, both text-writers and decisions, agrees that in a case of this kind the burden is upon the defendant to show by clear and satisfactory evidence that the insured did actually commit suicide; that a mere preponderance of evidence will not suffice.

In the case of *Cosmopolitan Life Ins. Co.* v. *Koegel,* 104 Va. 619, 52 S. E. 166, it is held that "The defense of suicide, to avail, must exclude every hypothesis of accidental death. The party making the defense has the burden of proof. It will not be presumed. The mere fact that the body of an insured is found with a pistol in his hand and a bullet wound in his head is not sufficient to prove suicide."

In that case, quoting with approval from high authority, it is further said: "Accidental death will be presumed, and this presumption must be overcome by the proof of facts which exclude every hypothesis of death except by suicide." And further, that "when the evidence as to whether death was accidental or suicidal leaves the question in doubt, the presumption is in favor of accident."

The doctrine laid down in the *Koegel case, supra,* is adhered to and emphasized by this court in the subsequent cases of *Life Insurance Co. of Va.* v. *Hairston,* 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989, and *Metropolitan Life Insurance Co.* v. *DeVault,* 109 Va. 392, 63 S. E. 982.

In the last-named case it is said: "When the evidence of self destruction is circumstantial, the defendant fails unless the circumstances exclude with reasonbale certainty any hypothesis of death by accident."

The principles announced in the Virginia cases prevail with unanimity in numerous cases in point from other jurisdictions where the defense of suicide is sought to be established by circumstantial evidence. Of these we shall refer to but one.

In the case of *Leman* v. *Manhattan Life Ins. Co.,* 46 La. Am. 1192, 15 South 389, 24 L. R. A. 589, 49 Am. St. Rep. 349, the suit was brought by a widow on a policy issued on the life of her husband. The jury found for the defendant on the defense of suicide, and on appeal the judgment upholding that verdict was reversed and a judgment entered in favor of the plaintiff for the amount of the policy. The facts were not unlike those in the case at bar, so far as the circumstances tending to support the theory of suicide were concerned. Briefly stated, the body was found with a wound from a gun-shot causing death; the discharged pistol was wedged as if it had been forced on the right hand; the body was reclining on a sofa, as of one sleeping, the left arm rested on the breast, the right leg crossed on the left, the head in the usual position of one in repose, there being no evidence of any convulsive movement. The court said: "The question is whether these appearances point to suicide, to the exclusion of any other cause? Why not, with equal potency, to accidental death or death by the hand of another? . . . When, as in this case, circumstantial evidence alone is relied on to estab-

lish suicide, it is at least within bounds to say the evidence must be of a character to exclude, with reasonable certainty, any other cause of death. If the evidence falls short of this exaction, the suicide is not proved. The fact of death remains, and that casts the liability on the company insuring against death, with the excepted case of self destruction, which the company fails to establish. This appreciation of the evidence and the burden of proof constrains us to set aside the verdict and judgment of the lower court in favor of the defendant."

In the case at bar the defendant company seeks to avoid the burden of proving that the insured committed suicide by attempting to show that he was insane at the time of his death, and that therefore the presumption against suicide never existed. Here again the defendant is confronted with another presumption, namely, that all men are presumed to be sane until the contrary is shown and the burden is upon the party alleging insanity to prove it. *Howard* v. *Howard,* 112 Va. 566, 72 S. E. 133.

The record fails to show one word or act of the insured up to the moment he was last seen to remotely suggest that he was insane. When last seen on the day of his death he was in his usual health and engaged, as usual, in the performance of his daily duties. It is true that the mother and certain relations of the insured are shown to have been insane, but it does not follow from this that the insured was insane. The result of the testimony of the experts in this case is that when the acts and demeanor of a person indicate insanity, the fact that he has had insane relatives strengthens the view that he is insane, but where no word or act on the part of the person whose sanity is questioned is shown, the fact that such person has had insane relatives, standing alone, raises no presumption of insanity. A critical reading of the record fails to disclose any demeanor, act or word on the part of the accused, at

any time, indicating that he was insane, and therefore the fact that he was shown to have had insane relatives, standing alone, does not prove that he was insane at the time of his death. Apart from the insanity of relatives, the only other circumstance relied on by the defendant as tending to show that the insured was insane, is that recently before his death he had lost flesh and was less talkative and jovial than usual. The experts agree that while these circumstances may be present in cases of insanity, they do not, standing alone, indicate that a person is insane. They may and often do arise from many physical causes having no relation whatever to the disease of insanity.

In concluding this branch of the case it is sufficient to say that, even if it be conceded that there is greater probability that the death of the insured resulted from a suicidal act than from an accident, still we cannot say that death by suicide is the only reasonable conclusion to be drawn from the evidence. The proof does not exclude, with reasonable certainity, death from accidental shooting, and the burden being upon the defendant to establish its defense by proof, it was properly left to the jury to say whether or not it was a case of suicide.

In the first assignment of error petitioner complains of the exclusion of the affidavit made by Dr. Baylor when the proof of death was made out, the point relied on being that petitioner was entitled to the benefit of his answer as to the special cause of the insured's death, the answer being: "Know of nothing unless it be hereditary insanity."

The statement of the attending physician in a proof of death would seem to be only necessary or valuable when the deceased has died from natural causes and has actually been attended by a physician. In such a case the insurance company has a right to know what the physician knows as to the cause of death. But in this case there was

no attending physician, and the answer of Dr. Baylor, which is mere conjecture, shows that he knew no more about what caused the death than anyone else who saw the dead body. But be that as it may, Dr. Baylor was subsequently introduced as a witness by the defendant and interrogated fully on this point, as to what he knew of the deceased in every way, and what he meant by the language of the answer he gave in the affidavit mentioned. All that he knew was thus put completely and effectually before the jury and the defendant suffered no prejudice whatsoever from the action complained of.

The second assignment of error is to the action of the circuit court in refusing to give certain instructions asked for by the defendant company, and in giving certain other instructions. The court's refusal to give instructions "A" and "C," asked for by the defendant and refused, may be dealt with together.

In his application for the policy sued on the insured was asked the following question: "Have any of your uncles or aunts had consumption or any hereditary disease? If so, on paternal or maternal side?" To which the insured replied "No." Instruction "A" told the jury that this answer was false and that it was material to the risk, and directed the jury to find for the defendant. Instruction "C" told the jury that if the insured, in answering the question mentioned, failed to disclose that his uncle, A. J. McGuire, had been afflicted with hereditary insanity, they must find for the defendant company.

These instructions were properly refused. The policy provides for two defenses only, namely, suicide within twelve months from the date of the policy and fraud. Untrue answers, in order to be fraudulent, must be wilfully false. *Mason* v. *Chappell*, 15 Gratt. (56 Va.) 582, settles the law in Virginia that the *scienter* must be shown. There is no evidence that the applicant for this insurance knew

that he had "uncles or aunts" who had been the victims of hereditary insanity. He doubtless knew that he had relatives who had been insane, but that this layman knew the characetr of their insanity is not to be presumed when learned experts who have testified in this case differ as to the hereditary nature of insanity, all agreeing that certain kinds of insanity are not hereditary. When the doctors differ as to the hereditary nature of insanity, it is hardly to be expected that a layman, unlearned in the tecnical meaning of medical terms, would know whether or not a particular case of insanity was hereditary. Further, the form of the question was well calculated to mislead the applicant. He was asked a number of questions as to his physical and mental condition, and immediately preceding the question and answer under consideration he was asked: (16) "Is any intimate associate, or any person in your immediate family or household now ill will consumption?" (17) "Has any one of them recently been ill, or died of that disease?" (18) "Have any of your uncles or aunts had consumption, or any hereditary disease?" This last question, certainly in view of those immediately preceding, would naturally have been regarded by the applicant as referring wholly to physical diesases, and it would be most natural for a layman to understand from the question that hereditary diseases of a like nature were referred to. Dr. Williams, the medical examiner for this company, who wrote out the answers of the applicant to these questions, when asked the meaning of the term "good health," said: "In the usual acceptation of the term, you would have reference to the physical condition." This witness is shown to have been, at the time, fully informed as to the family history of the applicant, and particularly as to the mental condition of his mother, uncles and aunts, and in answer to the question, "Were those answers as you wrote them, and made by Mr. Hurt, true at the time.

they were made?" he says: "So far as I know they were." It does not seem reasonable to suppose that the defendant intended, by the question under consideration, to include mental trouble in the language "consumption or any hereditary disease." If it did, it has only succeeded in making an erroneous impression upon the applicant and misleading him into ignorantly making the answer now complained of.

Apart, however, from these considerations, it appears that Dr. Williams, the medical examiner for the defendant company, who wrote out the answers of the deceased in his application for this policy, was well acquainted with his mother, uncles and aunts from his early boyhood, and was thoroughly familiar with their mental condition. It is a well settled principle that any knowledge which the agent of an insurance company may have is imputed to the company, and that medical examiners for insurance companies are considered as agents for the company and the company is bound by any information its medical examiner may have at the time he fills out the application for the insured. *Johnson* v. *Aetna Ins. Co.,* 123 Ga. 404, 51 S. E. 339, 107 Am. St. Rep. 92.

There is a very lengthy and luminous note to this case in the American State Reports in which it is said, citing numerous authorities in support of the proposition, that "The principle stated applies equally to medical examiners appointed by life insurance companies, though the application or policy may declare that such is not the case; for examiners are in law agents of the corporations selecting them and requiring the performance of their duties, including the asking of questions and the writing in the application of the response thereto. Hence, though a medical examiner omits an answer made by the applicant, or writes it out substantially different from the response actually given by him, and the insurer acts only on the an-

swers so written, still, as in law the medical examiner is the agent of the insurer and not of the insured, the former cannot escape liability on account of the failure of its medical examiner to perform his duty, nor even on account of his intentional misperformance of it. He is the agent of the insurer, and to it his knowledge is imputed, and if it issues its policy, it must be deemed to have done so after its agent had communicated to it all the facts made known to him, and it is estopped from contending to the contrary."

The defendant company, therefore, knew or could have had through its medical examiner all the information that it now claims to have desired to elicit by the question under consideration, and it is estopped from contending to the contrary.

Instruction "B" asked for by the defendant tells the jury. that the plaintiff's intestate committed suicide and peremptorily directs them to find for the defendant. Enough has been already said to show the fallacy of this instruction, and that it was properly refused.

The petition points out no error in the instructions given by the court, and an examination of them shows that they are free from objection.

The case having been fairly submitted to the jury, their verdict must, under the law, stand and the judgment upholding the same be affirmed.

*Affirmed.*