## TABOR v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Circuit Court of Appeals, Fourth Circuit. June 8, 1926.)

No. 2464.

**1. Insurance ⬤⟾668(12).**

Evidence as to whether insured had committed suicide, so as to preclude recovery under policy, *held* to present question for jury.

**2. Insurance ⬤⟾646(7).**

Presumption on issue of suicide raised by insurer is that deceased did not take his own life, but came to his death either accidentally or at hands of another.

**3. Insurance ⬤⟾646(7).**

Burden of establishing defense of suicide is on insurer interposing such plea.

**4. Insurance ⬤⟾665(6).**

Where evidence of suicide is circumstantial, it fails as defense to life policy, unless circumstances exclude with reasonable certainty any hypothesis of death by accident or act of another.

**5. Insurance ⬤⟾668(12).**

Determination of whether insured committed suicide *held* for jury, unless suicide was established conclusively.

In Error to the District Court of the United States for the Southern District of West Virginia, at Bluefield; George W. McClintic, Judge.

Action by Rosa B. Tabor against the Mutual Life Insurance Company of New York. Judgment for defendant, and plaintiff brings error. Reversed.

G. W. Howard, of Welch, W. Va. (Harman & Howard, of Welch, W. Va., on the brief), for plaintiff in error.

George S. Couch, of Charleston, W. Va. (Brown, Jackson & Knight, of Charleston, W. Va., on the brief), for defendant in error.

Before WADDILL, and PARKER, Circuit Judges, and ERNEST F. COCHRAN, District Judge.

WADDILL, Circuit Judge. This is an action in assumpsit, brought by Rosa B. Tabor, plaintiff, against the Mutual Life Insurance Company, a corporation, defendant, to recover on a policy of insurance issued by the defendant to Clifton C. Tabor, in which policy plaintiff was named beneficiary. Upon the conclusion of all the evidence, the trial court, on motion of the defendant, directed the jury to find a verdict for the defendant, which was accordingly done, and judgment for defendant entered thereon, from which action the writ of error herein was sued out. The parties will be referred to by their titles in the District Court.

The policy was for the sum of $5,000, and contained a provision for double indemnity in the case of death resulting directly from bodily injury, independently and exclusively from all other causes, and effected solely through external, violent, and accidental means, provided, however, that this double indemnity should not be payable in the event of assured's death by his own act, whether sane or insane. The policy was incontestable after two years for any cause, except nonpayment of premiums, and provided that the company should not be liable thereunder in

the event of the assured's death by his own act, whether sane or insane, during the period of one year after the date of issue of the policy. The policy was written on February 27, 1924, and within less than six months thereafter, to wit, on the 14th of August, 1924, the insured died of gunshot wounds, which the defendant claims were self-inflicted. The defendant pleaded non assumpsit, and set up as a special ground of defense, in accordance with section 64 of chapter 125 of the Code of West Virginia, that the plaintiff was not entitled to recover under the provisions of said policy concerning suicide. The suicide provision in question in the assured's application for insurance was as follows:

"During the period of one year following the date of issuance of this policy of insurance, for which application is made, (a) the risk of death will not be covered by the policy if such death occur by his own act, whether sane or insane."

The provision on the same subject contained in the policy issued pursuant to such application was:

"*Suicide.*—The company shall not be liable hereunder in the event of the assured's death by his own act, whether sane or insane, during a period of one year after the date of issue of this policy."

[1] The evidence shows that at 4 o'clock in the afternoon of August 13, 1924, Clifton C. Tabor, who was 34 years of age, accompanied by a young girl 17 years of age, by the name of Edna B. Phillips, walked from Wilcoe, McDowell county, W. Va., up a hollow or ravine nearby, known as Grapevine Hollow, where they sat on a grass plot until about 6 p. m., when two pistol shots were heard by sundry witnesses who lived substantially at the scene of the shooting.

A brief summary of the testimony as detailed by the witnesses, particularly those at the scene of the tragedy, will be given, with a view of showing as nearly as may be the real facts and circumstances surrounding the death of the assured, though necessarily the true solution of the same will depend largely upon the reasonable and fair inferences to be drawn from what occurred. The testimony of Miss Phillips, who was examined for the defendant, will be first given, quoting from the record, because of her prominence in connection with the affair, and the testimony of the other witnesses for the defendant will be then given, as following hers in natural sequence.

Edna B. Phillips, a witness for the defendant, upon being called, testified as follows:

"That she lived at Pageton, W. Va., and would be 18 years of age on the 20th day of April, 1925; that she lived with her father and mother; that she was with Clifton C. Tabor on August 13, 1924, when he received the gunshot wound in his left breast; that they were up at Grapevine Hollow, in McDowell county, near the power house; that she was behind the power house when Tabor received the wound; that she had known Cliff Tabor about four years, they having corresponded frequently during that time; that on August 13, 1924, she met Tabor at Hyman's store; that Tabor suggested they go up Grapevine Hollow, and they did; that they went up and sat down there behind the tipple, on a grassy place; that Tabor asked her, if he would shoot her, would she shoot him, and she said she would not do it; that Tabor then asked, 'Did I believe there was any hereafter?' and she replied, 'Sure, I did,' and then asked him if he did, and said, 'No,' and that Tabor said he was not afraid to die; that she did not see the first shot fired, as she was looking at a lady up on the hill, who was washing her hands; that after the first shot fired she tried to get to her feet, and some time after did get up; that she screamed and ran; that in a few minutes afterwards there was a second shot fired; that between the first and second shots Tabor told her 'that he shot himself.' He said 'he done it accidentally; that he would not have done it for nothing, but he said he done it accidentally;' that Tabor asked her to hand him the revolver, and she would not; that, just as the second shot was fired, she turned around toward Cliff Tabor, and it went off; that she saw Tabor with the revolver in his hand, said 'it was up like this,' and that she illustrated, by using the court's gavel, just what position Tabor held the revolver in, holding the gavel in her right hand and pointing toward her left breast; that after the shots were fired she noticed fire, she believed, on his right breast; that it was on the side where the bullets had entered; that she can read and write.

"On cross-examination, stated that she had known Clifton C. Tabor about four years, and that she saw him pretty frequently during that time; that he was of a jovial, lively disposition; that previous to the time she said he shot himself, and prior to the time she said he spoke of committing suicide, she had never heard him make any such remark before that time; that she went to Wilcoe from Welch about 10 o'clock on the morning that Tabor shot himself; that just after she got off the train, and went to Williams' store, she first saw Clifton Tabor that day; that she and Ta-

bor had not quarreled that day, and were the best of friends; that they had never had any quarrel with each other; that she knew of no earthly reason why Tabor should have shot himself; that so far as she knew Tabor was not in any trouble or worried about anything; that he had not, on that day, spoken of going to Graham to see his mother; that he told her he was going to Graham, but did not say he was going to see his mother; that she told him to go on, and he replied he would wait and go the next day; that * * * Tabor did nothing indicating that he would carry out his intention to commit suicide; that she saw him take the loads out of his pistol and lay them on the ground, and said, 'Cliff, be careful, that gun might go off,' and he replied, 'No, it won't;' that Tabor then put the cartridges back, and laid the gun on the ground, and then took it up, and the witness turned her head and was looking at the lady washing, and the gun went off, and the witness jumped up and ran to the corner, and stayed there a few minutes, and as she turned around the gun went off again; that it was two or three minutes between the two shots; that, just as she turned around, the gun went off; she said, 'I don't just exactly know whether I seen nary one of them. I didn't see the first one fired.'"

At the end of her statement, the witness denied having made a statement in the presence of Lewis and Werrels that insured "dropped the gun and it went off, and he picked it up, and it went off again."

The defendant next called B. G. Werrels, postmaster at Wilcoe, who testified that the shooting occurred within about 100 yards of his house; that he was within about 100 yards of Tabor when he heard the first shot; that it was about two minutes before the second shot was fired; that Gunnes, who lived up the right-hand hollow, ran across to the place where the shooting was heard; that he went to the scene of the shooting, and Cicero Lewis ran out of the left-hand hollow; that Tabor was lying on his back alongside of the hoisting house; that Cicero Lewis said Tabor's clothing was on fire; that witness put the fire out on one side and Lewis on the other. The witness, on cross-examination, stated that the girl (Edna Phillips) said that Tabor dropped the pistol, and it went off, and that he dropped it, and it went off again.

Clyde Lavinder, another witness for the defense, stated that he lived at Wilcoe, and was within about 200 feet of Clifton Tabor on the 13th of August, when he was shot; that he had gone off the hill to get his dog, and heard the first shot, and stepped back three or four steps, and the second shot went off; that,

after the first shot was fired, he stepped back to where he could see, and saw Edna Phillips standing up, screaming, and then the second shot went off; that he was looking at Edna Phillips when the second shot was fired, and saw her "very nice," but could not see Mr. Tabor, as he was lying in the weeds; that he could see one of her arms; that he did not see her fire the second shot; that he could have seen her if she had used her right hand, but could not see her left hand. On cross-examination, witness stated that it was about a minute between the first and second shots.

R. L. Taylor, another witness offered in behalf of the defendant, who lived in Bluefield, was a federal prohibition officer, and had been chief of police of the city of Bluefield for four years, and a member of the National Guard since 1895, and was in the Spanish-American War, and had had about 14 years' experience in the use of rifles and revolvers, testified as an expert as to the improbability of the happening of the accident from the indications of the wound and the manner in which the same was apparently inflicted, as well as the improbability of the pistol discharging upon falling to the ground.

The plaintiff, Rosa Tabor, mother of the insured, was called as a witness in her own behalf, and testified as to the death of her son in the hospital at Welch, W. Va.

Dr. C. F. Hicks, proprietor and owner of the Grace Hospital, was also called by the plaintiff, and testified as to the death of Tabor in his hospital at 10:30 on the morning of August 14, 1924, from a gunshot wound in the lung and chest; that there were two wounds, a bad one near the apex of the heart, about the left nipple, between the fourth and fifth ribs; that one bullet made its exit at the back of the chest, close to the tenth or twelfth rib, below where the bullet entered; that the other bullet did not come out; that both ranged backward and downward; that both wounds were from bullets fired from a rather large caliber gun; that both shirts were burned over an area of probably 8 or 10 inches square; that deceased had on a cotton outer shirt and a cotton undershirt; that powder burns were on the left chest, and were termed "first degree burns, producing a red area and breaking of the skin"; that he was unable to state whether there were any real powder or specks or not, but thought there was; that the two bullet wounds were about an inch and a half or probably two inches apart.

Cicero Lewis was also called as a witness in behalf of the plaintiff, and testified that he lived at Wilcoe, had known the deceased six or seven years, and was well acquainted with

him; that he kept a pool room at Wilcoe; that he had been a brakeman on the railroad; that the place at which Tabor was wounded was 150 yards from his home; that he heard the first shot while getting up from the supper table, and walked from the table to the other room, when the second shot was fired; there being an interval of about a minute between the shots; that he and Charlie Moore ran down the hill, reaching Tabor about a minute and a half after the second shot; that they found him on the ground, and the gun about 20 inches back of his head; that Tabor's shirt was on fire, and that Tabor was scratching at the fire on his chest; that the girl (Edna Phillips) was there with Tabor and about 5 or 6 feet away; that she was twitching her hands and crying; that the witness inquired, "Who did this?" and Tabor, raising his head up, stated, "It was an accident, Lewis," and laid back again; that witness then inquired, "Is this Cliff Tabor?" and either Tabor or the girl stated, "It is;" that Charlie Moore ran after the brother of Tabor, and the witness ran to call Werrels, the postmaster, who lived right below where they were; that, upon the arrival of Werrels, witness stated, "Cliff, how did this happen?" and Tabor replied, "It was an accident;" that Werrels had gotten there about a minute and a half after witness had come; that, in response to the question, "Cliff, how did this happen?" Tabor first said, "I did not do it," then caught his breath, and stated, "It was an accident;" that witness thought Tabor was dying when he reached him, as he had his eyes rolled back, and looked like he was helpless and life was leaving him; that witness saw Tabor about every day, or every other day; that he regarded Tabor as a good, sociable fellow, always in a good humor, and had no worries that witness could tell; that he seemed to be in good health, and he knew of no illness upon Tabor's part prior to the time of his death.

On cross-examination, Lewis stated that he was a car inspector, and used to brake on the railroad; that Tabor had ceased to work on the railroad for about a year; that Wilcoe was about five miles above Welch; that a mine of the United States Coal & Coke Company was located there, and that he knew the location of the engine hoist of that company, being about 150 yards down the hollow from where witness lived; that the dimensions of the hoist house were about 30x40, being a stone building; that between the hoist house and the hillside was a level grassy place; that the hoist house was about a quarter of a mile from the railroad station at Wilcoe; that he

and Mr. Werrels put out the fire on the shirt and undershirt on the left breast of Tabor.

On re-direct examination the witness Lewis further testified that Aubrey H. Tabor, the brother of deceased, for whom Charlie Moore had gone, came within five or ten minutes, and while witness was still there; that Aubrey Tabor stated, "Cliff, how did this happen?" and Cliff replied, "It was an accident"; that Aubrey said, "Now, Cliff, tell me the truth," and Cliff said, "Aubrey, I never told you a lie in my life."

Aubrey H. Tabor, another witness called for the plaintiff, testified that he was the brother of the deceased; that the latter was 34 years of age at the time of his death; that the witness lived at Wilcoe, and had been living there 13 years, being general yardmaster of the Norfolk & Western Railway Company; that he saw his brother two or three times a day; that for some time prior to his death his brother was in good health and good physical condition; that his brother was single and of a lively disposition, more so than any of the rest of the family, and made more friends; that the witness knew of no occurrences in his brother's life that should have brought about any worries on his part or would have caused him to take his life; that when witness got to where his brother was there was quite a crowd gathered; that he recalled the Phillips girl being there; that he got to where his brother was in not over five minutes after being informed by Moore that his brother was shot; that his brother stated he was fooling with the gun, and it went off accidentally and shot him; that the witness had an idea of something else; that his brother said to the witness, "Now, Aubrey," and kind of protested, and then said, "Aubrey, you know I have never told you a lie in my life; I did it, but I did it accidentally."

It was stipulated by counsel representing both sides that Clifton C. Tabor, at the time of his death, was a tax-collecting deputy sheriff of McDowell county, W. Va., with the right to carry a revolver, and had been such for some time prior to the 13th of August, 1924. The plaintiff also offered rebuttal testimony as follows:

Cicero Lewis testified that Edna Phillips, in the presence of B. G. Werrels, Mr. Goings, and other people, when asked how the accident happened, said, in substance, that Tabor dropped the pistol and it went off, and he picked it up and it went off again.

R. H. Powell, a witness called by the plaintiff in rebuttal, testified as to his intimate acquaintance with Clifton C. Tabor for

about 10 years, of his seeing Tabor frequently, that he was of a jovial, bright, and happy disposition; and that he saw him as late as 10 o'clock on the morning of the shooting, and there was nothing unusual in his mental or physical condition.

Upon the pleadings and proofs thus stated, it will be readily seen that the questions for determination are whether the trial judge was warranted in taking the case from the jury, directing a verdict in the defendant's favor, and rendering judgment thereon. The character of the case cannot, of course, be lost sight of in determining the propriety of the court's action as to whether the plaintiff's intestate committed suicide or came to his death as the result of accident or the act of another. It is conceded by the defendant that, on the issue of suicide thus raised, the burden of proof is upon it to establish the suicide of the deceased, and that the presumption is that he did not take his own life; that the defendant cannot recover on the issue thus raised, unless the fact of the defendant's intestate having taken his own life be so clearly established by the evidence as to be inconsistent with any other reasonable theory than that he deliberately destroyed himself; that is to say, that his death was not brought about by accident, or resulted from the act of another.

[2-5] In considering the crucial questions thus arising in this case, it seems clearly settled: (1) That the presumption on the issue of suicide raised by the defendant is that the deceased did not take his own life, but came to his death either accidentally or at the hands of another. (2) That the burden of proof to establish the defense of suicide is upon the defendant interposing the plea. (3) That, when the evidence of suicide is circumstantial, the same fails as a defense, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident, or by the act of another. (4) That the determination of these questions was for the jury, and not the court, unless the fact of suicide was established so conclusively as to leave no room for doubt or reasonable inference to the contrary; in a word, that the facts and circumstances were such as to be inconsistent with any other cause of death than that of suicide, and to so unmistakably lead to that result that no fair-minded and intelligent person could reach any other conclusion.

We might cite authorities without limit to sustain these several positions, but perhaps none do so more clearly than the decisions of our own court rendered comparatively recent-

13 F.(2d)—49

ly. In Fidelity Mut. Life Ass'n v. Miller et al., 92 F. 63, 70, 34 C. C. A. 211, 215 (C. C. A. 4th), involving the defense of suicide by drowning, the late Judge Morris, of the Maryland district, instructed the jury that the burden to establish such defense was upon the defendant interposing the same, that the presumptions were against suicide, and that the questions arising upon such issue were for the jury and not the court; the learned judge saying:

"The plaintiffs' second prayer asked me to say to the jury that upon the issue of suicide there was no legally sufficient evidence from which they can find that Percy committed suicide. I refuse this prayer, and leave the question of suicide to the jury. It is a matter with which a jury of 12 men is better able to deal than a single judge. Suicide is a matter generally incapable of direct proof, and as to which the jury are entitled to draw such reasonable inferences as the proven facts justify to the minds of men experienced in the affairs of life."

The rulings of the trial court in that case were approved by this court, and the verdict and judgment rendered in favor of the plaintiff affirmed.

In Parrish v. Order of United Commercial Travellers, 232 F. 425, 146 C. C. A. 419, a much more recent decision, this court gave much thought to and reviewed the general subject under consideration here, and in an opinion by Judge Woods covered virtually every feature of this case. In the Parrish Case the deceased was found dead in his own room, with his hand on a pistol lying between his legs, and a hole in his head. The plaintiff insisted, having regard to the presumption against death from suicide, and the burden of proof in respect to such defense, that a verdict should be instructed in his favor. This, however, the court declined to do, and submitted the case to the jury with appropriate instructions, and the jury rendered verdict in favor of the defendant. Judge Woods, speaking for the unanimous court on the appeal from that decision said:

"Did this evidence require the District Judge to direct a verdict for the plaintiff, or to leave the issue of accidental death or suicide to the jury? In Cosmopolitan Life Ins. Co. v. Koegal [Koegel] 104 Va. 619, 52 S. E. 166, the Supreme Court of Appeals states the rule that: 'Where the evidence of self-destruction is circumstantial, the defendant fails, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another.' We

cite a few of the many authorities holding this rule to be now unquestioned and restating it in different forms: Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; Life Ins. Co. of Va. v. Hairston, 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989; Metropolitan Life Ins. Co. v. De Vault, 109 Va. 392, 63 S. E. 982, 17 Ann. Cas. 27; Sou. Atl. Life Ins. Co. v. Hurt, 115 Va. 398, 79 S. E. 401; Cochran v. Mutual Life Ins. Co. (C. C.) 79 F. 46; Fidelity & Casualty Co. v. Egbert, 84 F. 410, 28 C. C. A. 281; Tackman v. Brotherhood of Am., 132 Iowa, 64, 106 N. W. 350, 8 L. R. A. (N. S.) 974; Cady v. Fidelity & Casualty Co., 134 Wis. 322, 113 N. W. 967, 17 L. R. A. (N. S.) 260; Wilkinson v. Ætna Life Ins. Co., 240 Ill. 205, 88 N. E. 550, 25 L. R. A. (N. S.) 1256, 130 Am. St. Rep. 269; Krogh v. Modern Brotherhood of Am., 153 Wis. 397, 141 N. W. 276, 45 L. R. A. (N. S.) 404; Bohaker v. Travelers' Ins. Co., 215 Mass. 32, 102 N. E. 342, 46 L. R. A. (N. S.) 543; Boynton v. Equitable Life Ins. [Assur.] Soc., 105 La. 202, 29 So. 490, 52 L. R. A. 687; Mallory v. Travelers' Ins. Co., 47 N. Y. 52, 7 Am. Rep. 410.

"In the Virginia cases, and all others to which we have referred, the question was not whether the jury should have been directed to find for the plaintiff, but whether a verdict in favor of the plaintiff should be set aside, on the ground that the evidence conclusively proved suicide. In view of the frequency of suicide, it cannot be doubted that some courts have gone very far in applying the rule of presumption against it; but all the authorities agree that, although the presumption is against suicide and the defendant must take the burden of showing it by clear and satisfactory evidence, and that the jury should be so instructed, yet where there is evidence so tending to support the defense of suicide that reasonable men might differ as to whether the inference of suicide or accidental death should be drawn, then the inference must be drawn by the jury and not the court. We find no clearer statement of the test required by common sense than that thus given in Life Ins. Co. of Va. v. Hairston, supra, by the Supreme Court of Appeals of Virginia, speaking through Judge Keith: 'We are of opinion that the defense of suicide should be established by clear and satisfactory proof, such as is required to establish a fraud.' "

As amplifying what was said by Judge Woods with particular regard to some of the features of this case, reference may be made to some of the leading cases bearing thereon. In Pythias Knights' Supreme Lodge v. Beck,

181 U. S. 49, 53, 21 S. Ct. 532, 533 (45 L. Ed. 741) Mr. Justice Brewer, speaking for the Supreme Court, said:

"Whether the deceased committed suicide was a question of fact, and a jury is the proper trier of such questions. It is not absolutely certain that the deceased committed suicide. * * * "

In Home Benefit Ass'n v. Sargent, 142 U. S. 691, 700, 12 S. Ct. 332, 335 (35 L. Ed. 1160), Mr. Justice Blatchford, speaking for the Supreme Court, said:

" * * * The jury were entirely at liberty to properly find that that wound, although self-inflicted, was accidental. The proofs of death and the entire evidence at the trial left it in doubt how Hall's death was caused, and it was for the jury to determine by their verdict. The court charged the jury that if they should find that Hall's death was caused by accident, they should find for the plaintiff. There was no exception to that instruction, and the case was tried on the theory that that was a correct construction of the policy. * * * "

In Metropolitan Life Ins. Co. v. Williamson, 174 F. 116, 117, 98 C. C. A. 90, 91 (C. C. A. Fifth Circuit), Judge Shelby, speaking for the court, said:

" * * * Whether he took the morphine with suicidal intent or not is a question of fact. No one can read all the evidence, and say that it conclusively and unquestionably shows that he did so. It is not inconsistent with the evidence to conclude that he took an overdose accidentally—that he intended only to take an amount sufficient to relieve his suffering and to secure sleep. The trial court clearly should not be reversed for submitting the question as to suicide to the jury. The authorities on this point, in cases involving the same question, are conclusive * * * " —citing Pythias Knights' Supreme Lodge v. Beck, 181 U. S. 49, 21 S. Ct. 532, 45 L. Ed. 741, supra, and Fidelity & Casualty Co. v. Love, 111 F. 773, 49 C. C. A. 602. Certiorari to the Supreme Court was denied in the Williamson Case, supra. 215 U. S. 608, 30 S. Ct. 409, 54 L. Ed. 347.

In South Atlantic Ins. Co. v. Hurt, 115 Va. 398, 401, 79 S. E. 401, 402, the Supreme Court of Appeals of Virginia held that:

"While two grounds of defense were set out by the defendant company, the record discloses that the real contest was that the insured committed suicide within twelve months after the date of the policy. The great weight of authority, both text-writers and decisions, agrees that in a case of this kind the burden

is upon the defendant to show by clear and satisfactory evidence that the insured did actually commit suicide; that a mere preponderance of evidence will not suffice. In the case of Cosmopolitan Life Ins. Co. v. Koegel, 104 Va. 619, 52 S. E. 166, it is held that 'the defense of suicide, to avail, must exclude every hypothesis of accidental death. The party making the defense has the burden of proof. It will not be presumed. The mere fact that the body of an insured is found with a pistol in his hand and a bullet wound in his head is not sufficient to prove suicide.' In that case, quoting with approval from high authority, it is further said: 'Accidental death will be presumed, and this presumption must be overcome by the proof of facts which exclude every hypothesis of death except by suicide.' And, further, that 'when the evidence as to whether death was accidental or suicidal leaves the question in doubt, the presumption is in favor of accident.'

"The doctrine laid down in the Koegel Case, supra, is adhered to and emphasized by this court in the subsequent cases of Life Insurance Co. of Va. v. Hairston, 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989, and Metropolitan Life Insurance Co. v. De Vault, 109 Va. 392, 63 S. E. 982 [17 Ann. Cas. 27]. In the last-named case it is said: 'When the evidence of self-destruction is circumstantial, the defendant fails unless the circumstances exclude with reasonable certainty any hypothesis of death by accident.' The principles announced in the Virginia cases prevail with unanimity in numerous cases in point from other jurisdictions where the defense of suicide is sought to be established by circumstantial evidence. * * *"

In McKendree v. Southern Life Ins. Co., 112 S. C. 335, at page 337, 99 S. E. 806, 807, the Supreme Court of South Carolina said:

"Action upon two contracts of insurance upon the life of S. Marshall MacKendree. The court directed a verdict for the defendant, upon the ground that the only reasonable conclusion to be drawn from the testimony was that the insured had suicided, which act by the words of the contract avoided the same. (1) A careful consideration of the testimony, after two arguments, brings us to the now settled conclusion that the issue of how the deceased met his death ought to have been submitted to the jury. The presumption of fact is that a man will not take his own life. Every action of a man, voluntary and involuntary, tends to preserve his life. The testimony in this case did not so far and so surely overcome that presumption as to have warranted the court to take issue from the jury."

In Balto. Life Ins. Co. of Balto., Md., v. Fahrney, 132 Md. 222, at pages 229, 230, 103 A. 450, 452, the Court of Appeals of that state said:

"In passing upon the action of the court in rejecting these prayers, we are not called upon to decide whether there is a preponderance of evidence in favor of suicide or death by accident; but, as we have said, we are asked to decide *as a matter of law* that upon the evidence offered the insured intentionally and designedly took his own life. To warrant us in so deciding, the evidence offered to overcome the presumption of death from accident should be so convincing that there could not reasonably be two opinions touching the result; for, if it were otherwise, it would be an invasion of the province of the jury to take the case from it. The question here, then, is: Are the facts proved such as to exclude every other reasonable inference than that the insured voluntarily took his own life? * * * The evidence offered to overcome the presumption of death from accident is not, we think, so convincing as to enable us to say there could not reasonably be two opinions as to how he met his death, by accident or suicide * * *" (citing cases).

In Goodbar v. Life Ins. Co., 89 W. Va. 221, 231, 108 S. E. 896, 900, President Ritz, speaking for the Supreme Court of Appeals of West Virginia, said:

"Instruction No. 3 is on the question of suicide. It tells the jury that, if there is a doubt whether the insured came to his death by suicide or natural causes, and there is no convincing evidence upon the cause of his death, the law presumes that his death was produced by natural causes; that the law requires more than a preponderance of the evidence to establish suicide; that every hypothesis consistent with death from natural causes must be excluded. This instruction is a fair statement of the law as to the character of proof required to establish death by suicide, and, while the defendant assigns as error the action of the court in giving it, no reason is given or argument adduced to support the assignment."

The decisions of the Supreme Court of North Carolina will be found to be in accord with those of the other states of this circuit on the questions involved in the instant case. Thaxton v. Ins. Co., 143 N. C. 33, 36, 39, 55 S. E. 419; Baker v. Massachusetts Mut. Life Ins. Co., 168 N. C. 87, 88, 83 S. E. 16.

We can but feel, having regard to the pe-

culiar facts and circumstances of this case, that the trial court was plainly in error in withdrawing the same from the consideration of the jury, and in directing a verdict and entering judgment thereon in favor of the defendant. The case is one, having regard to the many angles from which the testimony may be viewed, the weight that should properly be given thereto, and the fair and reasonable inferences that may be drawn therefrom, that particularly calls for determination by a jury, the constituted triers of the facts, rather than the judgment of a single judge.

Reversed.