# PYTHIAS KNIGHTS' SUPREME LODGE *v.* BECK.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 194. Submitted March 13, 1901.— Decided April 8, 1901.

*Patton* v. *Texas & Pacific Railway Company,* 179 U. S. 658, sustained and followed as to the relations of the trial court to the jury in regard to its finding.

The question whether the deceased did or did not commit suicide was one of fact, and after the jury had found that he did not, and its finding had been approved by the trial court and by the Court of Appeals, this court would not be justified in disturbing it.

On April 5, 1895, a certificate of membership, in the amount of $3000, was issued by the Supreme Lodge to Frank E. Beck, payable on his death to his widow, Mrs. Lillian H. Beck. The application for membership con-

tained this stipulation: "It is agreed that, if death shall result by sui-
cide, whether sane or insane, voluntary or involuntary, or if death is
caused or superinduced by the use of intoxicating liquors or by the use of
narcotics or opiates, or in consequence of a duel, or at the hands of justice,
or in violation of or attempt to violate any criminal law, then there shall
be paid only such a sum in proportion to the whole amount of the certifi-
cate as the matured life expectancy at the time of such death is to the
entire expectancy at date of acceptance of the application by the board
of control." It was on the conduct of Beck before he committed suicide
an instruction was asked for, which the trial court, in its charge to the
jury referred to as follows: "Here is an instruction asked, which I refused,
and I wish to state here that is the instruction that if Frank E. Beck was
violating any law at the time he was killed, why under the policy he can-
not recover—under the by-laws. As I understand that by-law, it must
be a case where a man is in the act of violating the law. For instance,
if a man in breaking into a house is killed in the act, he cannot recover.
If a man is in a quarrel and gets killed he cannot recover. But if a man
contemplating that he was going to kill his wife if she didn't go home with
him, but was not in the act and doing that at the time he was killed, that
clause of the policy does not apply." *Held*, that this instruction correctly
states the law.
The plaintiff, in her proofs of loss, stated that the deceased came to his
death by suicide, and to that effect was the verdict of the coroner's jury.
With respect to this the court charged that there was no estoppel; that
the plaintiff could explain the circumstances under which she signed the
statement, and that, while standing. alone, it would justify a verdict for
the defendant, yet, if explained, and the jury were satisfied that the death
did not result from suicide, she was not concluded by this declaration.
*Held*, that there was no error in this ruling.

On April 5, 1895, a certificate of membership, in the amount
of $3000, was issued by the plaintiff in error to Frank E. Beck,
payable on his death to his widow, Lillian H. Beck. The ap-
plication for membership contained this stipulation:

"It is agreed that, if death shall result by suicide, whether
sane or insane, voluntary or involuntary, or if death is caused
or superinduced by the use of intoxicating liquors or by the use
of narcotics or opiates, or in consequence of a duel, or at the
hands of justice, or in violation of or attempt to violate any
criminal law, then there shall be paid only such a sum in pro-
portion to the whole amount of the certificate as the matured
life expectancy at the time of such death is to the entire ex-
pectancy at date of acceptance of the application by the board
of control."

On October 31, 1896, he was killed by the discharge of a gun at the time held in his hands.   After his death a coroner's jury found that he died " by shooting himself in the head with a double barrel shotgun, with the purpose and intent of committing suicide, while temporarily insane, due probably to the use of intoxicants.   That the shooting was done in the outside water closet of the premises now occupied by the family of C. B. Nolan, and that he threatened to kill his wife before killing himself."   Proofs of death were furnished by his widow, in which question 14 and answer were as follows: " 14. Was death caused by suicide or violence or from other than natural causes ? A. Suicide."

On April 13, 1897, an action was commenced in the District Court of the First Judicial District of the State of Montana, in and for the county of Lewis and Clark, by his widow to recover $3000, the amount of the insurance.   This action was removed by the defendant to the Circuit Court of the United States for the District of Montana.   The answer set up specifically that the insured died from " self-destruction and suicide," and further, " that prior to said Beck taking his own life said Beck was attempting to and did violate the criminal laws of the State of Montana."   In the Circuit Court a trial was had, which resulted in a verdict and judgment for plaintiff.   The judgment was taken by the defendant to the United States Circuit Court of Appeals for the Ninth Circuit, and by that court affirmed May 16, 1899, 36 C. C. A. 467, to reverse which judgment of affirmance this writ of error was sued out.

*Mr. Carlos S. Hardy* for plaintiff in error.

*Mr. C. B. Nolan* for defendant in error.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

The principal question discussed by counsel for plaintiff in error, and the important question in the case, is whether the trial court erred in refusing a peremptory instruction to find a .

verdict for the defendant. It is said that the testimony established the fact of suicide, and that there was no sufficient doubt in respect thereto to justify a submission of the question to a jury. We have recently had before us a case coming, like this, from the trial court, through the Court of Appeals, *Patton* v. *Texas & Pacific Railway Company,* 179 U. S. 658, in which the action of the trial court in directing a verdict was vigorously attacked as an invasion of the province of the jury to determine every question of fact. That case stands over against this, for there the trial court directed a verdict. Here it refused to direct one. In each case its action was approved by the Court of Appeals. In that case, although the question was doubtful, we sustained the rulings of the lower courts, and the considerations which then controlled us compel a like action in the present case. We said that a trial court had the right, under certain conditions, to direct a verdict one way or the other, (citing several cases to that effect,) but added:

"It is undoubtedly true that cases are not to be lightly taken from the jury ; that jurors are the recognized triers of questions of fact, and that ordinarily negligence is so far a question of fact as to be properly submitted to and determined by them. *Richmond & Danville Railroad* v. *Powers,* 149 U. S. 43.

" Hence it is that seldom an appellate court reverses the action of a trial court in declining to give a peremptory instruction for a verdict one way or the other. At the same time, the judge is primarily responsible for the just outcome of the trial. He is not a mere moderator of a town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who in our jurisprudence stands charged with full responsibility. He has the same opportunity that jurors have for seeing the witnesses, for noting all those matters in a trial not capable of record, and when in his deliberate opinion there is no excuse for a verdict save in favor of one party, and he so rules by instructions to that effect, an appellate court will pay large respect to his judgment. And if such judgment is approved by the proper appellate court, this court, when called upon to review the proceedings of both courts, will rightfully be much influenced by their concurrent opinions." p. 660.

Whether the deceased committed suicide was a question of fact, and a jury is the proper trier of such questions. It is not absolutely certain that the deceased committed suicide. The following are the facts, at least, from the testimony, the jury was warranted in finding them to be the facts: The deceased and his wife had been married some six years. They had one child, a little girl, of whom he was very fond. They lived happily together except when he was drinking, and then he became irritable, and they quarreled. For six weeks prior and up to four days before his death he had not been drinking. The only evidence that he ever thought of taking his life is the testimony of a domestic, who had worked in the family for two or three years but had left a year and four months before his death, that when once she called his attention to the fact that he was drinking heavily, his reply was that "a man that has as much trouble as he had, the sooner the end came the better," and a similar remark at another time, that such a man "would be better off dead than living." Two days before his death his wife left her home and went to a neighbor's. He tried to persuade her to return, but she refused to do so while he was drinking. There were two guns in his house, one a single barrel shotgun, belonging to his wife, and one a double barrel shotgun, his own. The domestic then employed had concealed both by direction of Mrs. Beck. The day before the killing he went to a store in the city and hired a gun. He was at home the day of his death, sleeping a good deal. Late in the afternoon he got up and called for his gun, saying he was going hunting. Evidently he got his own gun or the gun he had hired the day before. In the evening he went to the house where his wife was staying and sought admission. A friend was with him. Admission was refused. He became demonstrative, and a call was made for a policeman, who soon came in a hack. The breaking of glass suggested that he had gotten into the house. The policeman went inside, when the hack driver, who had brought the policeman, called out that the deceased had gone into the back yard and into a water closet. The hack driver heard him go into the closet, and after a minute or so heard him step outside, and immediately the gun was discharged, and on examination

he was found with the upper part of his head shot off. It was so dark that no one saw the circumstances of the shooting. Whether it was accidental or intentional is a matter of surmise. The undertaker testified that there was a mark on the face under-the left eye as though the face had been pressed to the barrel of the gun; that -there were no powder marks on the face as there would have been had the gun not been held close to the skin. But whether that mark, if it came from the gun, was because he deliberately placed his head on the top of the gun, or, as·a drunken man, stumbled and fell against it, is a matter of conjecture. There was a dispute as to whether, in view of the length of the gun and the shortness of his arm, he could have reached the trigger without the aid of a pencil or piece of wood, no trace of which was found, or indeed looked for. Under those circumstances it is impossible to say that beyond dispute he committed suicide. The discharge of the gun may as well have happened from the careless conduct of a drunken man as from an intentional act. At any rate, the question was one of fact, and the jury found that he did not commit suicide, and after its finding has been approved by the trial court and the Court of Appeals, we are not justified in disturbing it.

Neither can it be said that death came "in violation of or attempt to violate any criminal law." Before he left home with the gun he said he was going hunting. While from his conduct he apparently changed his mind, and doubtless went to the house where his wife was stopping with the view of persuading or compelling her to return home, and may have intended violence against her if she refused, yet the death resulted not as a consequence of any violation or attempt to violate the criminal law. In this respect the court charged the jury as follows:

"Here is an instruction asked which I refuse, and I wish to state here that is the instruction that if Frank E. Beck was violating any law at the time he was killed, why under the policy he cannot recover—under the by-laws. As I understand that by-law, it must be a case where a man is in the act of violating the law. For instance, if a man in breaking into a house is killed in the act, he cannot recover. If a man is in a quarrel and gets killed he cannot recover. But if a man contemplating

that he was going to kill his wife if she didn't go home with him, but was not in the act and doing that at the time he was killed, that clause of the policy does not apply."

This instruction correctly states the law. The death must in some way come as a consequence of the violation or attempted violation of the criminal law, and the stipulation does not apply when it is simply contemporaneous and in no manner connected with the alleged violation or attempt to violate. For instance, if the deceased had started with the avowed intent to kill his wife, and while walking down the street a tree had fallen and killed him, the fact that he was starting upon an intentional violation of the law would not make this stipulation applicable, because the cause of his death would be entirely disconnected from the criminal act. So here, whatever may have been the general thought and purpose running in his mind as he went to the house where his wife was, his act in going into and stepping out of the water closet was in no manner connected with or part of an attempt to carry out any criminal purpose, and at that time came the shot, intentional or accidental, which killed him.

These are the substantial matters presented in the record. There are one or two minor questions. For instance, when the undertaker was on the witness stand, the defendant produced a gun and asked him to show the jury how the mark which he said he found on the face of the deceased could be caused, and the gun was used for that purpose. On cross-examination it appeared that his arm was not long enough to reach the trigger, and, therefore, to fire it off in the position in which he had placed it he needed a pencil or something of that kind. Subsequently, the plaintiff introduced testimony tending to show the length of the arm of the deceased and the improbability of his being able to reach the trigger, with his face on the muzzle, as described by the undertaker, which testimony was objected to on the ground that the gun had not been identified as the one which had caused the death, but the objection was overruled and the testimony admitted. There was testimony subsequently offered by her as to its identity, but that testimony was, to say the least, not clear and satisfactory, so that it cannot be said

that the gun was fully identified as the one which caused his death.   Still, we cannot think that this furnishes a sufficient ground for reversing the judgment.   The defendant produced the gun, and while it cannot be said that the mere production carried with it a declaration that this was the gun which caused the death, yet it certainly suggested the fact, and if not so it ought to have offered testimony to that effect.   It presented the gun for use and illustration before the jury, and there was no material error in permitting the plaintiff to use the same gun for the purposes of other illustration, especially when she followed that with testimony tending, although, perhaps, only slightly, to identify it.

Another matter is this: The plaintiff in her proofs of loss stated that the deceased came to his death by suicide, and to that effect was the verdict of the coroner's jury.  With respect to this matter the court charged that there was no estoppel; that the plaintiff could explain the circumstances under which she signed the statement, and that while standing alone it would justify a verdict for the defendant, yet if explained and the jury were satisfied that the death did not arise from suicide, she was not concluded by this declaration.   We see no error in this ruling.   None of the elements of estoppel enter into the declaration.   The condition of the defendant was not changed by it, and if under a misapprehension of facts she made a statement which was not in fact true, she could explain the circumstances under which she made the statement and introduce testimony to establish the truth.

Some other matters are mentioned in the brief of plaintiff in error, but nothing that we deem of sufficient importance to deserve notice.   We see no error in the judgment, and it is

*Affirmed.*