It is conceded that defendant is a fraternal benefit society and that its benefit certificate on the life of Emery Ingle in favor of plaintiff, his wife, was in full force and effect at the time of insured's death. The defendant refused to pay the policy and its defense of this suit is based on the ground that the manner and cause of the insured's death rendered the policy void under the clause following: "If the member holding this certificate . . . shall die . . . from the direct result of drinking intoxicating liquors, . . . or by his own hand or act, whether sane or insane . . . or in consequence of the violation or attempted violation of the laws of the State, . . . this certificate shall be null and void." The defendant alleged in its answer and undertook the burden of proving that the insured's death was the direct result of drinking intoxicating liquors and in consequence of the violation of the laws of the State. The plaintiff offered no evidence on this point but rested her case on the *Page 599 
facts elicited by the direct and cross-examination of defendant's witnesses. It appears, however, that defendant called most if not all the witnesses whose evidence would be valuable, using plaintiff's evidence given at the coroner's inquest as an admission against interest. These witnesses were friends and relatives of the deceased but that only went to their credibility which was in general, though not as to particulars, vouched for by defendant.
Since the jury found for plaintiff we must take the facts supported by substantial evidence most favorable to her side of the case, which are in brief as follows: The insured came to his death by a gun shot wound fired from a shot gun in his own hands about midnight while he was in the act of opening or passing through a revolving gate at the house of one Riddle just across the street from his own home in the town of Duenweg, Jasper County, Missouri. To what extent this was due to accident, to the insured's intoxication and the unlawful possession and use of the gun is the question presented. The deceased went to Joplin in the evening in an automobile with some friends including a brother-in-law and while there was drinking — "took a few drinks," as his brother-in-lay testified. He returned home about eleven o'clock at night and at once began quarreling with and threatening his wife, accusing her of `following him." He seized his wife and choked her but she escaped and went across the street to the home of Mr. Riddle where her brother-in-law was staying. The insured followed his wife in a few minutes and with profane language ordered her to go home. She purported to obey but instead went into a vacant lot and later to another neighbor's house. The deceased had a shot gun with which he smashed in the door of Riddle's house and in doing so broke the stock off the gun retaining the loaded barrel. He then went home and not finding his wife soon returned to the Riddle home, was yet boisterous and broke a window and again left with the gun barrel going toward his *Page 600 
home. In the meantime his little boy had gone into the street and was crying. The brother-in-law, Verne Cunningham, went and picked up the child, the deceased came to him and together they returned to the Riddle house and at the gate, some hundred and twenty-five feet from the house, the gun barrel, being still in deceased's hands, was discharged killing him almost instantly. His brother-in-law was the only one who did or could tell exactly what occurred at the time the gun was discharged. He testified: "He (insured) had not just returned from Riddle's at the time of the shooting but was outside the gate coming from towards his own house, not coming from Riddle's house. He was on the outside of the gate coming from his house. I judge it was about ten minutes from the time he left Riddle's house until the shooting occurred. I did not exactly see the gun. It was dark. I know he had it in his hand. I saw the fire. The stock was not on the barrel at the time. All he had was the barrel. He fired it. He pushed it against the gate post. The gate turns around. The muzzle of the gun was towards him. He took the gun and pushed it on one of those things to turn the gate around and as he did the gun went off. At the time there was no trouble at all. Everything was perfectly peaceful. He talked to me as though he was ashamed of himself. He said he had been a mean son of a bitch. That was after he left Riddle's house the last time. He wasn't quarreling with me. The child and I were the only persons there. He wasn't quarreling with the child. I had the child in my arms and we were standing there. There was no ill feeling between him or any one around there at the time. . . . It was some time after he left Riddle's house before the shooting occurred. About ten minutes anyhow. It was a brother older than my brother John that he drove off from the house with the gun. This took place some time before that. After he came back he went home and then back to Riddle's. If there had been any trouble that was half an hour before the firing of the shot." *Page 601 
On this point Mr. Riddle testified: "The deceased came to my house twice that evening. The second time he left my house, if there had been any trouble it had quieted down and he went on peacefully. He walked peacefully down towards the gate. Was standing at the gate talking to the boys. No trouble was brewing at that time. When the gun was fired I don't know how it happened. The stock of the gun was lying on my porch and when he left my house all he had of the gun was the barrel of the gun. . . . The gate is I expect 125 feet, maybe more, from my house. Was in a position so that if there had been any disturbance going on out there, I would have heard it. There was nothing of the kind. The gate was of the kind that turns around as you go into it." Mrs. A.F. Lewis testified: "My home is right across the alley from Mrs. Ingle. About fifty feet away, I judge. I was sitting in my dining room window looking out at the time the shot was fired. I could see Mr. Ingle out there where the shot took place. He was not engaged in any angry altercation or waving a gun or disturbing the peace in any way that I could see at that time. He was standing there talking very quiet for several minutes. I ran back into the bedroom. I couldn't see the gun. It was a shot gun. The scream first attracted my attention. I went and got up and didn't see anything. After a while I saw Mr. Ingle go across the road. I supposed it was his wife that screamed. It was a woman's voice. Emery (the insured) went then to his brother-in-law's, Mr. Riddle's. I do not know what he did there. After that I saw him come back across the road home. He went into the house. I can't say for certain how long he stayed in the house. I think it was about an hour from the time I heard the scream until the shot was fired. . . . The shooting occurred right at the gate. I didn't hear what Mr. Ingle said. I heard him talking to Mr. Cunningham. Verne said, "You ain't mad at me, are you Emery? and he said, "No, I am not mad at you." That was the only *Page 602 
sentence they spoke . . . He came back across the road leisurely and quietly and stood there talking peacefully to some party at the gate for several minutes before the shot was fired."
There was evidence that the insured was when sober a peaceable man and kind to his family; and to hold that his outrageous conduct on this occasion was due to his drinking is the most charitable excuse suggested. The evidence, however, strongly tends to prove that his passions had largely subsided and that he was in a calmer and repentant mood at the time he discharged the gun into his own body by attempting to push open the revolving gate therewith.
The defendant insists that the facts conclusively show that the deceased's death was the direct result of his intoxication and was in consequence of his violating the law. The defense pleaded is that insured while in an intoxicated condition did unlawfully and feloniously while in the presence of various persons exhibit in a rude, angry and threatening manner a deadly weapon and while so doing discharged same inflicting his death wound. The jury evidently found the facts to be in accordance with plaintiff's instruction to the effect that, although deceased after drinking intoxicating liquors did exhibit a deadly weapon in an angry and threatening manner in the presence of various persons, yet if he had abandoned such acts for a period of time prior to his death and was quiet and peaceable and did in a peaceful manner attempt to turn the gate with the shot gun, thereby accidentally discharging same and causing his death, then the defendant is liable.
This instruction is supported by the evidence and is, we think, in accordance with the law on this subject. It is not the law, as defendant argues and as his refused instructions declare, that mere proof that one meets his death while violating the law or while intoxicated avoids a policy containing a clause such as is shown here. [Griffin v. Western Mut. Benev. Assn. (Neb.), 31 N.W. 122.] The intoxication or law violation *Page 603 
must be the direct or proximate cause of the death and there must be a direct and necessary causal connection between the alleged cause and the result. [Accident Ins. Co. v. Bennett (Tenn.), 16 S.W. 723; Bloom v. Franklin Life Ins. Co. (Ind.), 49 Am. Rep. 469, 474.] As said in Supreme Lodge K. of P. v. Crenshal (Ga.), 58 S.E. 628, 13 L.R.A. (N.S. 258, 265; "Certificates issued by benefit societies usually contain a stipulation that the society shall not be liable in case of death of a member while engaged in, or in consequence of an unlawful act. A contract having such a stipulation is not avoided by the mere fact that, at the time of the death of the member, he was violating the law, if the death occurred from some cause other than such violation. The rule seems to be that, in order to relieve the society, the violation of the law must be such as to proximately lead to the death of the insured by bringing him into danger of losing his life; that is, the act of the insured must be of such a character as to increase the risk of the insurer, and be entered into under such circumstances that the insured must have known that the act he was committing was of such character as to bring him into danger of losing his life." The exact point ruled in that case is that, under a clause similar to this one, the killing of the insured by the husband who caught him in the act of committing adultery with his wife does not release the insurer. It is there stated that there are many instances in which it can be truly said that the death of the insured would not have occurred except for the commission of a crime and yet such death is not the reasonable and natural consequence of the crime committed. This is a leading case and the authorities cited in the opinion and in the editorial note thereto show that such is the law in most if not all jurisdictions. In Bradley v. Mut. Ben. Ins. Co., 45 N.Y. 422, 6 Am. Rep. 115, the rule is stated thus: "It seems to be clear that a relation must exist between the violation of law and the death, to make good the defense; that the death must *Page 604 
have been caused by the violation of the law, to exempt the company from liability. It cannot be the true meaning of the proviso that the policy is to be avoided by the mere fact that, at the time of the death, the assured was violating the law, if the death occurred from some cause other than such violation." The case of Supreme Lodge v. Beck, 181 U.S. 49, 45 Law. Ed. 741, 21 Sup. Ct. Rep. 532, is somewhat similar to this case and it was ruled that to discharge the insurer "the death must, in some way, come as a consequence of the violation, or attempted violation, of the criminal law; and the stipulation does not apply when it is simply contemporaneous and in no manner connected with the alleged violation or attempt to violate." In that case the insured had gone to a neighbor's house with a gun to induce by threats or force his wife to return home and discharged the gun killing himself while coming out of an out building into which he had gone after having attempted to enter the house where his wife was. The unlawful acts of the insured were held not to have been the cause of the death since his going into and coming out of the outbuilding was not directly connected with or part of an attempt to carry out any criminal purpose.
It has been held in this State in Harper v. Ins. Co.,19 Mo. 506, that though one is a violator of the law in assaulting another, yet if after such assault he seeks to withdraw from the difficulty and avoid further trouble, but is followed and killed by his adversary, his death does not fall within the meaning of the policy clause similar to this one. Judge SCOTT uses this language: "If the person whose life is insured, uses offensive language to one, whilst they are engaged in an unlawful game of chance, which language is concerning the game, and he is shot down for the provocation, it would not be maintained that he died in the known violation of the law of the land, within the meaning of the contract. So, if he is riding a race in a public highway, which is forbidden, and his horse *Page 605 
falls and he is thrown, and his neck broken, he does not die in the known violation of the law of the land, within the meaning of the terms of the condition. So, also, in a quarrel, if he assaults another with his open hand, and is thereupon instantly shot down, he does not die in the known violation of the law, within the intent of the policy." A similar ruling is made in Brown v. Supreme Lodge, 83 Mo. 633, where the death occurred in an ordinary fight in which the deceased was the aggressor. The court said such a case was not "within the contemplation of the contracting parties." Railway Mail Ass. v. Moseley, 211 F. 1, is an instructive case citing and reviewing many authorities. The court held that a policy excluding death resulting from the insured's "vicious conduct" was not avoided where the insured assaulted a police officer and then fled but was pursued by such officer and killed by him through a spirit of revenge, since the death was not the proximate cause of the insured's prior vicious conduct. [Supreme Lodge v. Bradley (Ark.), 83 S.W. 1055, 67 L.R.A. 770.]
In the present case the attempt of the insured to open the gate by pushing it with the butt end of the loaded gun barrel was not itself a violation of the law and not directly connected with his previous unlawful conduct either toward his wife or in handling the gun.
There is less reason for holding that insured's death was the direct result of his drinking intoxicating liquors. The immediate cause of insured's death was his act of thrusting the gun against the gate to open it. That act might be justly characterized as grossly negligent and his negligence was doubtless caused in whole or in part by his intoxication. Gross negligence, however, does not make such a policy void even in accident insurance. [Lovelace v. Travelers' Protective Ass'n, 126 Mo. 104, 28 S.W. 877; Joyce on Insurance, sec. 2845.] And in seeking the cause of the negligent act, itself the primary cause of the death, we are seeking the cause of the cause and thus going beyond *Page 606 
the direct or proximate cause. [5 Joyce on Insurance, sec. 2832A.] On this point the court instructed the jury that, although the insured was under the influence of intoxicating liquors at the time of his death, yet if such death was not the direct result of such intoxication to find for plaintiff; and on defendant's request, that if at the time of his death the insured was under the influence of intoxicants and that his death was the direct result of the use of such intoxicants then to find for defendant whether said insured "intentionally or unintentionally caused his own death." These instructions state the law favorable enough for the defendant and if they are too general in their terms then the same fault is common to each. The court properly refused to instruct that if the insured was intoxicated and was also flourishing or exhibiting a deadly weapon at the time he shot himself then he was violating the law and to find for defendant. It is not the law, as we have seen, that the mere fact of insured's being intoxicated or engaged in violating the law or both at the time of his death works a forfeiture of benefits under the policy clause in question; but there must be a causal connection between such act or acts and the ensuing death. The one must be the proximate and efficient cause of the other. Coincidence in point of time is not alone sufficient. The result is that the judgment should be and is affirmed. Farrington andBradley, JJ., concur.