[Civil No. 3115. Filed March 21, 1932.]

[9 Pac. (2d) 191.]

JOSEPHINE S. A. YOUNG, Appellant, v. THE PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA, a Corporation, Appellee.

Mr. Louis G. Hummel, for Appellant.

Messrs. Kingan, Darnell & Nave, for Appellee.

ROSS, J.—On April 13, 1928, Mannierre E. Young obtained an accident policy for $10,000, and on May 7th another accident policy for $5,000 from the defendant, the Pacific Mutual Life Insurance Company, in which his wife, the plaintiff, was named the beneficiary. The insured died October 30, 1928. This suit was brought to collect the amounts of the two policies. After plaintiff had introduced her evidence and rested, the defendant made a motion for a directed verdict on the ground of failure of proof. This motion was granted. It is this ruling of which plaintiff complains.

The two policies were the same except as to amount and date. They indemnified the insured "against loss of life, limbs or sight, . . . resulting directly and independently of all other causes, from bodily

injuries effected through external, violent and accidental means," with the exception (among others) of "loss resulting directly or indirectly in whole or in part from suicide, sane or insane, or any attempt thereat sane or insane."

The plaintiff in her complaint alleges as the cause of death the felonious administration of poison to the insured, by some person or persons unknown to her, without his knowledge; or the taking of poison by him, by mistake or accident, thinking it "a harmless powder to induce sleep and allay nervousness and insomnia, with which he was afflicted for several months before his death." The defendant's answer averred the insured committed suicide.

The plaintiff insists that she had made out a *prima facie* case of accidental death and was entitled to have the jury pass on it. The defendant contends that her evidence failed to show that the insured came to his death by accidental means, and that there was therefore nothing to submit to a jury.

We think the weight of authority is to the effect that a plaintiff suing to recover on an accident policy, conditioned as the ones we are here considering, must first establish the fact of death or injury by accident or accidental means, and that until he does so no case is made out; but, if he has introduced evidence showing death or injury to have been the result of accident, the burden of proof is then on the insurer to establish that the loss was within some exception to the policy. Couch, Cyclopedia of Insurance Law, vol. 8, p. 7173; 14 R. C. L. 1437, § 599; 1 C. J. 496, § 284. Under this rule it was incumbent on plaintiff to prove by a preponderance of the evidence (1) the death of the insured, and (2) that it was caused by external, violent, and accidental means. If the plaintiff's evidence at the conclusion of her case showed that the insured committed suicide, or was such as to exclude

all reasonable hypotheses that the death was accidental, there would be no liability under the policy, and the direction to the jury was proper; but, if the evidence as to the manner and means of death was such that reasonable persons might differ as to whether the insured designedly took his own life or was killed by accidental means, then it was a question that should properly have gone to the jury. In such case the plaintiff is favored with the presumption of law against self-destruction. In other words, if it appear that the insured died as the result of accident or suicide, and there was no evidence to show which was the cause, and the cause might be equally referred to either accident or design, the presumption of law is that death was accidental (*Travelers' Ins. Co.* v. *Nicklas,* 88 Md. 470, 41 Atl. 906), and in such case the burden of proving suicide or self-destruction would be upon the insurer. *Travelers' Ins. Co. of Hartford* v. *McConkey,* 127 U. S. 661, 32 L. Ed. 308, 8 Sup. Ct. Rep. 1360; *Supreme Lodge K. P.* v. *Beck,* 181 U. S. 49, 45 L. Ed. 741, 21 Sup. Ct. Rep. 532; *Parrish* v. *Order of Commercial Travelers,* (C. C. A.) 232 Fed. 425; *Wilkinson* v. *Aetna Life Ins. Co.,* 240 Ill. 205, 130 Am. St. Rep. 269, 25 L. R. A. (N. S.) 1256, 88 N. E. 550; *Brunswick* v. *Standard Acc. Ins. Co.,* 278 Mo. 154, 7 A. L. R. 1213, 213 S. W. 45.

With the rules that should guide us in mind, we turn to the evidence, as introduced by the plaintiff to sustain her cause of action, to see if under it she was entitled to have the jury pass on her case; or whether the evidence showed, to the exclusion of every reasonable hypothesis of accident, that the insured committed suicide. If from the evidence but one conclusion could be drawn by reasonable persons, and such conclusion is that he committed suicide, then the action of the court in directing the verdict

was proper. It will be necessary to state the facts rather completely, and they are as follows:

The insured was well educated, well read, intelligent, a good talker and refined. At the time he took out the policies he lived at Sonoita, Santa Cruz county, Arizona, and was the general manager of a placer mining company. Besides his wife, his family consisted of two minor children, named as beneficiaries in case his wife should predecease him. Five months after taking out the policies, or about October 26th, the insured showed up in Las Vegas, New Mexico, under the assumed name of "James Breen." He had no money, and very little clothing aside from what he had on. He registered at the Albert Hotel as from Las Cruces, New Mexico, but said he was from the east and was looking for a site upon which to build a hotel. He was evidently trying to get to Colorado Springs, where, from his conversations and a telegram he left with the Postal Telegraph Company to be sent to a man by the name of Gray, he expected to get financial assistance. He employed one James Hogg to take him by automobile as far as Raton, New Mexico, in the direction of Colorado Springs, agreeing to pay him $30. They left Las Vegas on the morning of October 29th and got as far as Springer. Before leaving the insured gave Hogg a check on a Las Vegas bank for $10 as part payment. At Springer, Hogg, becoming suspicious, telephoned the bank on which the check was drawn and learned the insured had no account there. He brought insured back to Las Vegas and turned him over to the chief of police to be put in the city jail. Insured begged Hogg not to disgrace him thus and also tried to persuade the chief of police not to lock him up, stating that he had never been put in jail in his life. He got pretty nervous and acted like he was worried and begged to be allowed to stay at a

hotel. Without any charge being preferred against him, and with the assurance that none would be if he paid the check the following morning, he was put in the city jail, about midnight of October 29th. He was left in the corridor surrounding the cells, where there were a stove, a sink and a faucet. In this room at the time there were, as the chief said, "just a few young men (6) staying overnight, just lodgers for the night, boys around eighteen or twenty years." Later two Mexican wood haulers were, at their request, it being a very cold night, given lodging in the same room. These two Mexicans asked the jailer to call for them at 4 or 5 o'clock in the morning. The jailer called at 4:45 and discovered that the insured was dead, but warm. The two Mexicans told him insured was sick. He was lying on papers on the floor of the jail with a coat under his head, mouth open, tongue discolored and protruding. Near his head and within his reach was a collapsible drinking cup containing cyanide in solution. On or near the body was a cigarette package containing cyanide. The insured and all the others who occupied the jail that night were searched "for a knife, razor, gun, or any kind of weapon," and the insured had in his possession a cigarette package. But whàt was in the package was not determined at the time, the searching officer stating he "felt the package and put it back in the pocket." The searcher did not find on the insured any collapsible cup.

The other occupants of the jail were questioned as to the insured's actions during the night, and nothing could be learned therefrom. They were all released at 9:30 o'clock that morning on the advice of the district attorney that it was not necessary to hold them.

Cyanide was used by the police to kill stray dogs around the jail, but it was kept under lock.

"Breen," during the four or five days he was in Las Vegas, was pleasant and agreeable in his contacts and visited and talked with people freely.

That the insured died as the result of cyanide poisoning there can be no question. It is equally certain that it was not administered by any third person. The inmates of the jail were strangers to each other, thrown together just for the night. Their misfortunes evidently created a fellow feeling. They were doubtless all broke, without money, and in a strange land. The incentive of finding upon the insured's person money or jewels or property of value could not have been present. To say that the evidence shows, or tends to show that the persons lodging in the jail, or some one of them, on the night of October 30th, either designedly or innocently administered to the insured the cyanide, is, we think, unjustified and a misinterpretation of the evidence.

We think all the evidence points to the insured as a person who not only furnished the cyanide but administered it, and the question is reduced to this, Did he do it designedly or "by mistake or accident thinking it a harmless powder to induce sleep and allay nervousness and insomnia," as alleged in the complaint? There is absolutely no evidence to the effect that the insured might have thought he was taking "a harmless powder." If the evidence showed that he had reached into a medicine cabinet where there were two kinds of medicine, in like packages or of like color and consistency, one poisonous and the other a harmless sleeping powder, and by mistake had taken the poison, it would present a question of fact as to whether the cause of death was accidental or suicidal. But that is not the situation here. The cyanide taken by the insured unquestionably came out of a cigarette package. No cyanide was found except in the cigarette package and in the

cup from which the cyanide was drunk. When searched at the time he was placed in jail the insured had a cigarette package. Counsel for plaintiff is not right when he states the insured had no cyanide when placed in jail. If he had said none was found by the officer who searched him he would be more nearly correct. But it is also a fact that he was not searched for anything but weapons. The cigarette package was not opened or looked into to determine its contents. The fact is there was in insured's possession when he was put in jail a cigarette package with contents unknown. The following morning a cigarette package was found near or on the body of the insured with contents known to be cyanide, and there was no other cigarette package on or near his body. These circumstances point with reasonable certainty to the insured as the carrier of the cyanide, and, when taken in connection with the other facts stated below quite conclusively show insured did not die by accidental means. The insured was a well-educated and refined person and was about to be exposed. He could not take care of the bogus check the following morning. He was faced with the disgrace and ignominy of being charged with a criminal offense which might result in imprisonment. He had no money, and, if he had any friends, he had run away from them and to hide his identity was going under an assumed name. He was, and had been for several months, suffering from nervousness and insomnia, according to the complaint. It looks as though he deliberately chose the cyanide route, rather than face the horrors of exposure.

But plaintiff reasons this way. She says the cup had been used by the police to give stray dogs cyanide; that insured must have taken a drink from the cup, and that enough cyanide had clung to the cup to cause his death. This is all conjecture and specula-

tion. There was no evidence whatever that the cup had been used in the manner suggested. The evidence is that the cyanide kept at the city jail was locked up and therefore not accessible to the insured or to the other inmates of the jail on the night insured died. Besides, it occurs to us that, had the insured been poisoned in the manner suggested, he would have made it known to his companions and they would have been required to testify at the inquest. If it was self-administered with suicidal intent, the probabilities are he would not have consciously disclosed that fact to his jail companions. Again, if insured was poisoned in the manner suggested, why were others not also poisoned when drinking from the cup?

When plaintiff closed her case, she had not proved that the insured's death was the result of an accident, and, the burden of doing so being on her, the court properly directed a verdict. See authorities above.

The judgment is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.