## KANSAS CITY LIFE INS. CO. v. BOWMAN.
### No. 8993.

Circuit Court of Appeals, Ninth Circuit. March 15, 1939.

Dan B. Shields, of Salt Lake City, Utah, and F. M. Bistline, of Pocatello, Idaho, for appellant.

Jones, Pomeroy & Jones, of Pocatello, Idaho, for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

The only question presented is whether or not there is any substantial evidence to support a verdict that deceased met his death by accidental means and not by suicide.

Appellant, on February 25, 1926, issued a policy of life insurance on the life of John D. Bowman, the deceased, thereby promising to pay appellee, $2500 "upon receipt of due proof of the death" of insured, or in lieu thereof the amount of $5,000 "in the event of the accidental death of the insured as hereinafter defined". The proof of accidental death required was that the "death resulted directly and independently of all other causes from bodily injuries, effected solely through external, violent and accidental means * * * except that this double indemnity benefit shall not be payable if the Insured's death shall result directly or indirectly, wholly or partly from suicide, whether sane or insane * * *".

On December 1, 1935, deceased, a farmer, suffered a cerebral thrombosis, which is a clot on the brain producing a paralytic action. Deceased's right side was paralyzed, and he was confined to bed about six or seven weeks, but his condition improved and was improving up to the time of his death. He was able to perform various chores, such as milking cows, chopping kindling, shovelling snow, feeding and watering stock, irrigating, drove a derrick team for about two hundred tons of hay, drove a car, and helped with the threshing and repairing of machinery.

On February 16, 1937, deceased was in perfect physical condition, except that the grip of his right hand was impaired, and at times he dropped objects and especially dishes when he was wiping them. He also had a pronounced speech impediment. On the date mentioned, deceased arose, made the fires, and after breakfast, went to the barnyard to help haul some hay. There were a number of birds around the premises. He ate a hearty mid-day meal, helped appellee with the dishes, and at about 1:30 p.m. went to his son's home, which was about 250 feet northwest of the barn, to get his shotgun. At that time he was cheerful and "smiled all the time". As he left the house with the gun, he motioned to birds flying from trees and said "birds". About an hour later he was at a store, and there purchased two shells. He told the store-owner that he was going to shoot birds. He was in the habit of buying only two or three shells at a time.

Deceased's daughter-in-law saw him as he was going toward the barn about 3:30 p.m. About five minutes later she heard a shot and noticed birds flying in all directions. The report of the shot indi-

cated that it was made in the direction of the barn. About twenty minutes later, the daughter-in-law heard another shot, which sounded as if it had been made about the same place as the first shot.

About 25 minutes later deceased was found dead, lying on his back under a window in the southwest corner of the hay loft in the barn. The gun, lying diagonally across the body near the feet, contained an empty shell. Another empty shell was found to the right of the body. The only thing found around the body was a piece of lumber, upon which were alfalfa leaves, indicating that it had not been disturbed. The shot pattern on the ceiling was almost directly over deceased's feet. The jumper had two holes in it, and the shot apparently had struck the left side of the coat and the left side of deceased's face.

A son of deceased, who was practically the same height, demonstrated to the jury that when the gun was placed with its butt on the floor, he could not reach the trigger, without bending over. When he bent over so that he could press the trigger the end of the gun barrel extended over the top of his left shoulder.

There was also evidence that the deceased was not worried over finances, that he was not in debt, and that he could not have pressed the trigger with his foot because of the size of his shoe.

Appellant's evidence consisted of testimony of a sheriff concerning some tests made by him, and evidence concerning the nature of the wound inflicted. The sheriff cocked the gun, raised it about a foot off the floor and dropped it. The gun was not discharged by any of the twelve trials. The evidence of the nature of the wound, which we will not relate because of its gory nature, was as consistent with the theory of accidental death, as it was with the theory of suicide.

Appellant contends: "The possibility of an accidental discharge of this gun was left entirely to the imagination of the jury. Plaintiff made no attempt to prove that it was possible for this gun to be discharged other than by pulling the trigger. The theory of accidental discharge was left entirely to speculation and conjecture." We are not in accord with that contention. The evidence disclosed that the deceased could not have inflicted the wound by pressing the trigger with his finger, and that there was no contrivance near the body which could have been used to press the trigger. The jury could, we think, properly infer that the death was accidental. Supreme Lodge K. P. of the World v. Beck, 181 U.S. 49, 54, 21 S.Ct. 532, 45 L.Ed. 741.

Affirmed.