HODGES v. NEW YORK LIFE INS. CO.
Civ. A. No. 255.

District Court, E. D. Virginia, at Norfolk.
March 2, 1948.

James G. Martin, of Norfolk, Va., for plaintiff.

Eppa Hunton, IV., of Richmond, Va., for defendant.

PAUL, District Judge.

This action is upon a policy of insurance issued by defendant upon the life of George Dewey Hodges in favor of his wife, Edna G. Hodges, as beneficiary. The policy was in the face value of $10,000.00 with the so-called "double indemnity" benefits, providing for the payment of an ad-

ditional $10,000.00 upon proof that the death of the insured resulted from injury effected through "external, violent and accidental means"; with a further provision making certain exceptions from the operation of the double indemnity clause. Among these was death resulting directly or indirectly from "war or any act incident thereto". The provisions as to double indemnity, along with the exceptions thereto, are those usually found in policies of this sort and are more or less standard.

The insured was the master of the steamship Onondago and lost his life when his ship was sunk around 4:00 or 4:30 o'clock on the afternoon of July 23, 1942, some four or five miles off the northern coast of Cuba. The Onondago was owned by the Ford Motor Company but was apparently being operated by, or under the direction of the War Shipping Administration. It appears that at the time of her sinking she was bound for Mobile, Alabama, with a cargo of ore of some sort which she had loaded a day or two previously at Neuvitas, Cuba. As the result of the sinking eighteen of the ship's personnel were lost, including the insured; there were fourteen survivors.

In submitting proof of death to the defendant company to obtain payment of the policy, the plaintiff did so on the form provided by the company for that purpose in which she stated the cause of death as "accidental drowning". In lieu of the certificate of the attending physician which is customarily required by the insurer, the plaintiff submitted to defendant as proof of the fact of death certain communications which she had received shortly after the sinking from her husband's employer, Ford Motor Company, and from the United States Coast Guard. The first of these was a telegram from the Commandant of the Coast Guard expressing the regret of the Navy Department in being compelled to inform her that her husband was missing "following action in the performance of his duty and in the service of his country" and that further information would be furnished when received. About ten or twelve days later Mrs. Hodges received a letter from Coast Guard Headquarters in which it was stated that her husband's ship had been "lost through enemy action" and that her husband had been seen to go down with his ship and was reported missing. The later letter from Ford Motor Company to plaintiff expresses regret at the death of her husband but does not recite the circumstances thereof. The defendant accepted the telegram and the letters as sufficient proof of the death of the insured and paid the $10,000.00 face value of the policy. It, however, denied liability under the double indemnity clause on the ground that it plainly appeared that the death resulted from "war or an act incident thereto".

Thereafter this action was brought to collect the $10,000.00 double indemnity. It does not appear, and it is not contended, that the plaintiff has ever submitted any amended or additional proof of death, or any statement or information in addition to that above referred to.

The parties entered into a stipulation of the facts upon which they were agreed and which includes substantially every pertinent fact, except the cause of the sinking of the Onondago. In this stipulation they reserved the right to introduce further evidence at the trial, which has now been had before a jury. At the conclusion of plaintiff's evidence, the defendant moved for a directed verdict in its favor. This motion the court declined to grant at the time but took under consideration and reserved action thereon. Thereafter the defendant introduced certain evidence in its behalf and at the conclusion of all the evidence renewed its motion for a directed verdict; upon which the court reserved action. The case was submitted to the jury, resulting in a verdict in favor of the plaintiff in amount of the double indemnity. Thereupon the defendant moved to set the verdict aside and for entry of judgment in its favor on the grounds asserted in its motion for a directed verdict and upon the further grounds of misdirection of the jury and that the verdict was plainly contrary to the evidence.

## Discussion

The policy in the instant case, as is customary in all such policies, conditions payment under it upon receipt of due

proof of death of the insured. In making the proof of death necessary the defendant, as do all insurance companies, customarily required a statement from the attending physician of the deceased, setting forth the fact of death and the cause and the circumstances thereof; and, in case of a coroner's inquest, a copy of the findings of such inquest. This statement is an essential part of the proof of death, the submission of which is necessary to impose any liability upon the insurer. And proof that due proof of death has been made is necessary in order to maintain an action on the policy.

In the circumstances of this case there could, of course, be no certificate of an attending physician or other similar means of proving the death or the causes of it. In lieu of this the claimant submitted the communications from the Coast Guard as showing the fact of death and its cause. These the insurer accepted as sufficient. But it seems clear that without them, or without similar statements from some source setting forth the fact and the cause of death, no obligation arose to make payment under the policy. The matter contained in the proofs of death was that upon which the beneficiary based her claim for payment. This matter was not separable, to be accepted in part and rejected in part. It was upon the full circumstances disclosed that she asked the defendant to accept it as a fact that the insured was dead.

The defendant bases its motion for a directed verdict upon the principle that a proof of loss submitted for the purpose of obtaining payment of an insurance policy constitutes prima facie evidence of the facts stated therein in favor of the insurer and that the claimant under the policy is bound by the statements made in the proofs of loss in the absence of a showing by the claimant that the statements were made under a misapprehension or mistake or in ignorance of material facts subsequently ascertained.

A number of cases are cited in support of this proposition. Among these is Metropolitan Ins. Co. v. Rutherford, 98 Va. 195,

35 S.E. 361, 362, where the principle is thus stated:

"By the express terms of the contracts of insurance, these proofs were declared to be evidence in favor of the company, but not against it. But, independent of any agreement to that effect, the preliminary proofs presented to an insurance company, in compliance with the condition of its policy of insurance, are admissible as prima facie evidence of the facts stated therein in favor of the company. They were intended for the action of the company, and upon their truth it had a right to rely, and, unless corrected for mistake, the plaintiff was bound by them. Good faith required that she be held to answers and statements made in the proofs of loss until it was shown that she was under a misapprehension of the facts, or ignorant of material matters subsequently ascertained."

Another case involving the question here involved is that of Hassencamp v. Mutual Benefit Life Ins. Co., 4 Cir., 120 F. 475. In that case the proofs of death consisted of the certificate of the attending physician of the deceased stating that death occurred by suicide from shooting, together with the finding of a coroner's jury to the same effect. Upon these the company denied liability. In a suit on the policy and after the proofs had been placed in evidence by the defendant, the plaintiff offered some testimony tending to show an absence of motive for suicide. The court instructed a verdict in favor of defendant on the ground that the statements contained in the proofs of loss were binding on the plaintiff to the extent of being prima facie evidence against the plaintiff of the facts stated therein as to the manner or cause of the death of the insured, except in so far as they might be shown by proof to be mistaken or erroneous; and that as the plaintiff had offered no legally sufficient evidence that the statements contained in the proofs that the death occurred by suicide were erroneous, the verdict must be for the defendant.

In affirming the action of the lower court, the Court of Appeals first points out that, as held in Supreme Lodge K. P. v. Beck, 181 U.S. 49, 21 S.Ct. 532, 45 L.Ed..

741 the statements in a proof of death do not constitute an estoppel against the claimant, but that the party furnishing such proofs may thereafter show that they are erroneous, or given by mistake or under a misapprehension. But it then says [4 Cir. 120 F. 479]:

"Until such explanation, however, those proofs are to be taken as true, and are, as before stated, prima facie evidence of the facts they contain. The question before us, therefore, is, did the plaintiff in error * * * make any explanation of these facts, or introduce testimony showing that in furnishing them she had been mistaken, or that they were erroneous."

Referring to the testimony of witnesses for the plaintiff, the court says:

"There was nothing in the testimony of these witnesses to contradict the fact stated in the proofs that the assured came to his death by suicide. It was not suggested by the plaintiff in error that she furnished the proofs under any misapprehension whatever, and she gave no explanation of the cause of her husband's death inconsistent with the facts contained in the proofs. It is true that the testimony in rebuttal tended to prove absence of motive to suicide; but was this sufficient to overcome the fact distinctly stated in the proofs of death presented to the insurance company? This evidence did not directly contradict that fact. It did not show that the statement in the proof was erroneous. We think, therefore, that the instructions to the jury, as given by the Circuit Court, were in entire harmony with the law * * *."

The leading case of Insurance Co. v. Newton, 22 Wall. 32, 22 L.Ed. 793, is closely applicable here. In that case the proofs of death consisted of affidavits giving the time, place and circumstances of death and the record of a coroner's inquest, the finding of which was that the deceased had committed suicide. The insurer made no question of the sufficiency of the proofs as establishing the fact of death but denied liability on the ground that the proofs showed a suicidal death. Without alleging that the proofs were submitted under any mistake or misapprehension of fact, the beneficiary sued on the policy. On the trial the court held that due proof of death had been made, as shown by their acceptance by the company without question. But when the company sought to introduce the proofs stating the cause of death as suicide, they were excluded, and the case was allowed to go to the jury under an instruction that the burden of showing suicide rested on the defendant. In reversing the lower court, the Supreme Court said, in part:

"The Court below allowed the statement of the company and its agent to the witness as to the sufficiency of the proofs of death of the insured to be received as conclusive of that fact, but by its charge to the jury in effect separated the admission of that fact from its accompanying language, that the proofs disclosed a case of suicide, and held that this latter statement was of an independent fact to be established by the company. In this particular we think the court erred. Every admission is to be taken as an entirety of the fact which makes for the one side, with the qualifications which limit, modify or destroy its effect on the other side. This is a settled principle which has passed by its universality into an axiom of the law. Here the admission related to the two particulars which the proofs established, the death of the insured and the manner of his death, both of which facts appear by the same documents. They showed the death of the insured only as they showed that he had committed suicide, and all that the officers of the company evidently intended by their declaration was that they were satisfied with the proofs of the one fact because they established the other. The whole admission should, therefore, have been taken together. If it was sufficient to establish the death of the insured, it was also sufficient to show that the death was occasioned in such manner as to relieve the Company from responsibility."

Again the Court, in holding that there was error in excluding the proofs of death from evidence, says:

"* * * the proofs presented were admissible as representations on the part of the party for whose benefit the policies

were taken, as to the death and the manner of the death of the insured. They were presented to the company in compliance with the condition of the policy requiring notice and proof of the death of the insured as preliminary to the payment of the insurance money. They were intended for the action of the company, and upon their truth the company had a right to rely. Unless corrected for mistake, the insured was bound by them. Good faith and fair dealing required that she should be held to representations deliberately made until it was shown that they were made under a misapprehension of the facts, or in ignorance of material matters subsequently ascertained."

Having now had an opportunity to consider the effect of the foregoing cases and their applicability to the situation disclosed by the record in this case (an opportunity not afforded in the midst of a trial), I am of opinion that the motion for a directed verdict should have been granted at the conclusion of plaintiff's evidence.

■ The cases cited do not hold, nor is it contended by defendant, that the statements contained in a proof of death work a conclusive estoppel against the claimant. It was clearly held in Supreme Lodge K. P. v. Beck, 9 Cir., 94 F. 751, affirmed in 181 U.S. 49, 21 S.Ct. 532, 45 L.Ed. 741, that they do not, and that the claimant may show that the statements in the proof were made under a misapprehension of the true facts. It is upon this case that plaintiff relies. But in this same case (94 F. at page 753) it is also stated that where proofs of loss show death to be due to a cause for which no liability under the policy exists, they constitute prima facie proof that death was due to such cause and, in the absence of evidence to the contrary, are conclusive against the the claimant. In that particular case the proofs had stated that death was due to suicide. In a suit on the policy the claimant introduced substantial evidence tending to show that the wound causing death was not self-inflicted and that the statements made in the proof of death were made under a misapprehension of the true facts. From the plaintiff's standpoint the case holds no more than that the evidence there was sufficient to raise a question justifying submission to the jury.

■ In the instant case, however, the plaintiff has introduced no evidence of any probative force in denial of the statements contained in the proof of death; in fact, no evidence whatever that she did not have at the time she submitted the proofs. She has never asserted that the proofs of death were made under a mistake or that there have been any facts subsequently ascertained which deny them. What the claimant is attempting here is this: She has obtained payment of the face of the policy by stating that her husband lost his life through the sinking of his ship by an act of war. She now seeks the double indemnity by ignoring (in effect repudiating) this statement and seeking to impose on defendant the burden of proving the very thing which she herself has asserted and on which defendant relied. She still relies on the proofs of death to prove that the death was by violent and accidental means but she wishes to escape what these proofs show as to the nature of these violent and accidental means. In this regard the case of Insurance Co. v. Newton, hereinbefore quoted from, is particularly applicable, wherein it condemned the attempt to separate the admissions made in the proofs of death and pointed out that the admissions related to two particulars, "the death of the insured and the manner of his death, both of which facts appear by the same documents", and, after stating that the whole of the admission (in the proofs) should be taken together, said: "If it was sufficient to establish the death of the insured, it was also sufficient to show that the death was occasioned in such manner as to relieve the company from responsibility."

The plaintiff does not deny that the proofs of death may be considered by the jury, but argues, so it seems, that they are to be given only such weight as the jury chooses to give them in determining the cause of death. This argument might have merit if there were any evidence of substance contrary to the facts stated in the proofs. But a jury cannot be left free to ignore the statements in the proofs where, as in this case, no evidence has

been offered which appreciably contradicts them. Aside from the proofs themselves, the only evidence offered by the plaintiff was that of one of the surviving members of the ship's crew, whose testimony tended to support rather than to deny the statements that the ship was sunk through an act of war.

This witness was F. R. Dennis, the third mate. So far as pertinent here his testimony was that the sinking of the ship occurred about 4:30 in the afternoon; that he (the witness) was in his room and heard Capt. Hodges shout loudly twice ("hollered" was the term used by the witness) but was unable to distinguish any words; that he (the witness) ran out of his room and up onto the boat deck and found the ship settling fast in the water; that the water was coming up on deck so fast that there was no time to launch a boat, but that he turned a raft loose and jumped overboard; that just before he jumped he saw Capt. Hodges coming down the ladder from off the bridge; that no more than a minute elapsed between the time he heard Capt. Hodges shouting until the ship went under; that, on jumping overboard, he (the witness) went under the water and that when he came to the surface the ship had disappeared ("completely submerged"); that he swam to the raft and thereafter assisted in rescuing other men from the water. Asked if he knew what caused the ship to sink, this witness answered, "I couldn't exactly say, because I didn't hear any explosion and didn't see anything"; that he had not seen any submarine or any torpedo.

It is to be noted that when the will of Capt. Hodges was offered for probate in the state court on August 10, 1942, this same witness (Dennis) had been offered as a witness to prove the death of the testator and at that time had testified that in his belief the ship had been torpedoed and had answered a number of questions based on that assumption and without questioning the correctness of it. It is also true that the testimony in the probate proceeding was given prior to the filing of the proofs of death with the insurer and was, of course, known to the claimant when she submitted the proofs.

But entirely aside from this, it is clear that the testimony of this witness, as outlined above, in no way denies the statements in the proofs of death. So far as it is affirmative, in reciting the captain's outcry and the conditions under which the vessel sank it tends to confirm that the vessel was torpedoed. And there is little, if any contradiction of this in the negative testimony that the witness did not hear the explosion and did not see any submarine or any torpedo (neither of which he could have seen when in his room).

But even if we ignore the statements in the proofs of death and assume that there was an issue as to the cause of death requiring the defendant to assume the burden of proving that death was due to an act of war, I am of opinion that that burden was satisfied and that the verdict should be set aside as plainly contrary to the evidence. The defendant offered the testimony of three surviving members of the crew. One of these, Brocca, does not make clear exactly where he was on the ship other than that he was amidship over the engine room and below the upper deck. He testifies that there was a loud explosion on the right side of the ship; that he could see "things shooting up into the air; everything went sky-high"; that there was a "big gusher of water went up" along the side of the ship; that he ran up onto the boat deck and remembers nothing more.

The witness Petersen, whose deposition was read in evidence, testified that just prior to the sinking of the ship he was sitting on the poop deck, which he described as being to the stern of the ship; that he was looking forward and had in full view Capt. Hodges, who was forward on the bridge of the ship and looking out over the sea; that he saw Capt. Hodges look out at the water aft and to the right side of the ship ("over to the starboard quarter") and heard him shout "Everybody stand clear aft"; that he (the witness) got to his feet with the intention of looking out to sea in the direction in which the Captain was looking, but before he could do so there came "a white flash and sharp explosion" on the starboard quarter of the ship and that he (the wit-

ness) was knocked unconscious; that he supposes he went to the bottom of the sea and when. he finally came to the surface the vessel had disappeared and there was nothing to be seen but floating wreckage and the two life rafts, to one of which he swam and was saved. The witness says that he would call the explosion an "external" one because it was "just on the side of the ship".

The remaining witness, Weir, was also on the poop deck and his testimony is in all pertinent respects in accord with that of Petersen, except that he states the Captain's outcry just before the explosion to have been "All hands clear; here she comes". All of the witnesses agree that the ship sank within a very brief period, probably a minute or less, following the explosion.

In view of this evidence there is no room for any reasonable doubt that the ship was torpedoed, and any other conclusion would be without a basis on which to rest. In urging that an issue was presented for the jury the plaintiff argues that the sinking might have been due to an explosion of the ship's boilers or to the fact (mentioned by one of the witnesses) that the vessel had run aground on a sand bar or something of the sort near Key West several weeks before. To attribute the loss of the ship to either of these causes would be the purest surmise—surmise which not only is unsupported by any evidence but is denied by the evidence. There was no evidence that the ship was injured when it ran aground near Key West and during the several weeks between that incident and the sinking the vessel had been at sea with no signs of trouble of any sort. Had the hull become weakened so as to cause leakage, any condition endangering the ship would have come on gradually, not instantly; and would have first become discoverable from the engine room or elsewhere below deck, and not from the bridge. As to the surmise that the ship's boilers might have exploded, it need only be pointed out (1) that the engine room was in the middle of the ship while the explosion came on the starboard quarter, and (2) that Capt. Hodges could not from his position on the bridge have foreseen that the boilers were about to explode and cried his warning for that reason. Nor is there force in the argument that none of the witnesses saw a torpedo or a submarine. With the possible exception of the witness Brocca, it is clear that none of them were in position to see any torpedo coming from off the starboard quarter or any submarine in that direction. The witness Dennis was in his room and Petersen and Weir, although on deck, were looking forward and not astern when the explosion came. No one knows what Captain Hodges saw which caused his cry of warning, but it seems clear that it was some danger impending on his ship from the quarter where the explosion occurred an instant after his outcry.

On the evidence there is no reasonable hypothesis to account for the sinking of this ship, except that it was due to an act of war. The verdict of the jury will have to be set aside and judgment entered for the defendant.